No. 05-60321

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

GULF RESTORATION NETWORK; SIERRA CLUB; LOUISIANA CHARTER
BOAT ASSOCIATION
Petitioners,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
Respondent

PETITION FOR REVIEW OF A LICENSE DECISION BY THE U.S.
SECRETARY OF TRANSPORTATION

_____

ORIGINAL BRIEF FOR PETITIONERS
_____

TULANE ENVIRONMENTAL LAW CLINIC
KARLA RAETTIG (La. Bar No. 27860)
6329 Freret St.
New Orleans, LA 70118
Tel: (504) 865-5789
Fax: (504) 862-8721
Contact Information Until October 31:
5633 SE Schiller Blvd.
Portland, OR 97206
Tel: (504) 452-3156
Attorney for Petitioners,
Gulf Restoration Network, Sierra Club, and
Louisiana Charter Boat Association

# CERTIFICATE OF INTERESTED PERSONS

GULF RESTORATION NETWORK; SIERRA CLUB; LOUISIANA CHARTER
BOAT ASSOCIATION,
Petitioners,

v.                                                        No. 05-60321

UNITED STATES DEPARTMENT OF TRANSPORTATION,
Respondent.

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Fed. R. App. P. 28.2.1 have an

interest in the outcome of this case.  These representations are made in order that

the judges of this court may evaluate possible disqualification or recusal.

Governmental entities and officials are not listed.

Gulf Restoration Network . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Petitioner

Sierra Club . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Petitioner

Louisiana Charter Boat Association . . . . . . . . . . . . . . . . . . . . . . . . . . Petitioner

Karla Raettig  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attorney for Petitioners

Gulf Landing, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Intervenor

ConocoPhillips, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Intervenor

David Savage  . . . . . . . . . . . . . . . . . . . Attorney for Intervenor Gulf Landing, Inc.

Warren Harris . . . . . . . . . . . . . . . . .    Attorney for Intervenor ConocoPhillips, Inc.

Kevin Ewing . . . . . . . . . . . . . . . . . .    Attorney for Intervenor ConocoPhillips, Inc.

_____

Karla Raettig (La. Bar No. 27860)

## STATEMENT REGARDING ORAL ARGUMENT

The Petitioners respectfully request oral argument.  This case is an appeal of a license decision by the U.S. Secretary of Transportation under the Deepwater Port Act and presents issues of first impression.  Oral argument would allow Counsel to answer any questions about the unique procedural posture and legal questions presented by this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.    THE SECRETARY VIOLATED NEPA BY FAILING TO EXAMINE
       REASONABLY FORESEEABLE CUMULATIVE IMPACTS FROM
       OTHER GULF OF MEXICO LNG FACILITIES. . . . . . . . . . . . . . . . . . 14

       A.    NEPA Requires That The Secretary Examine Cumulative Impacts
             From "Past, Present, And Reasonably Foreseeable Future Actions."
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       B.    The Secretary Violated NEPA By Failing To Examine Reasonably
             Foreseeable Cumulative Impacts From  LNG Ports In The Gulf of
             Mexico. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1.    The Secretary's justification for excluding deepwater ports for which he had received applications but without draft NEPA documents is arbitrary and capricious because the Deepwater Port Act requires detailed information in the application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2.    The Secretary acted arbitrarily and capriciously by excluding ports east of the Mississippi River plume. . . . . . . . . . . . . . . 20

3.    The Secretary's failure to examine cumulative impacts makes the Final EIS invalid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.    THE SECRETARY VIOLATED THE DEEPWATER PORT ACT BY FAILING TO REQUIRE THAT THE GULF LANDING FACILITY USE A CLOSED LOOP SYSTEM, WHICH IS "THE BEST AVAILABLE TECHNOLOGY [] TO PREVENT OR MINIMIZE ADVERSE IMPACT ON THE MARINE ENVIRONMENT." . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A.    The Secretary Admitted That The Open Loop System Has A Higher Effect On "Water Quality And Marine Life." . . . . . . . . . . . . . . . . . 25

B.    The Expert Agencies In Marine Fisheries Found That A Closed Loop System Was "The Best Available Technology, So As To Prevent Or Minimize Adverse Impact On The Marine Environment." . . . . . . . 26

C.    The Secretary Failure To Examine Reasonably Foreseeable Cumulative Impacts Skewed His Decision With Respect To The Best Available Technology For The Marine Environment. . . . . . . . . . . . 29

IV.    Petitioners Have Standing to Prosecute this Regulatory Appeal. . . . . . . . . 30

A.    Individual Petitioner Members Have Standing. . . . . . . . . . . . . . . . 31

1.    Petitioners' Members Have Suffered an Injury-in-Fact. . . . . 31

2.    The Injury Is Fairly Traceable to the U.S. Department of Transportation's Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

3.    The Injury is Redressable by this Court. . . . . . . . . . . . . . . . 32

B.     This Proceeding is Germane to Petitioners' Purposes. . . . . . . . . . 33

C.     The Proceeding Does Not Require Individual Participation. . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## CASES

*Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989) . . . . 2

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 29

*City of Shoreacres v. Waterworth*, 450 F.3d 440 (5th Cir. 2005) . . . . . . . . . . 18, 19

*City of Tacoma v. Nat'l Marine Fisheries Serv.*, 383 F. Supp. 2d 89 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167 (2000) . . . . . . . 32

*Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir. 1985) *abrogated on other grounds by Sabine River Authority v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977) . . . . . . . . 30

*Idaho Rivers United v. Foss*, 373 F. Supp. 2d 1158 (D. Idaho 2005) . . . . . . . . . . 3

*Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 646 F.2d 215 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Motor Vehicle Mfr. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Robertson v. Methow Valley Citizens Council, Inc.*, 490 U.S. 332 (1989). . . . . . 16

*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . 18, 19

*Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434 (5th Cir. 2001). . . . 13, 29

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
207 F.3d 789 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

## STATUTES

Administrative Procedures Act, 5 U.S.C. § 706 . . . . . . . . . . . . . . . . . 11-13, 16, 24

Deepwater Port Act, 33 U.S.C. §§ 1501-1524. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Deepwater Port Act, 33 U.S.C. § 1503 . . . . . . . . . . . . . . . . . 3, 11, 12, 23, 25, 33

Deepwater Port Act, 33 U.S.C. § 1504 . . . . . . . . . . . . . . . . . . . . 4, 9, 15, 19, 22

Deepwater Port Act, 33 U.S.C. § 1516. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

NEPA, 42 U.S.C. §§ 4331-4335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

NEPA, 42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

## REGULATIONS

33 C.F.R. § 148.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 C.F.R. § 148.710 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

33 C.F.R. § 148.725 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

40 C.F.R. § 1508.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

49 C.F.R. § 1.66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MISCELLANEOUS

69 Fed. Reg. 35,655 (June 25, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Final Environmental Impact Statement for the Gulf Landing LLC Deepwater Port
License Application (Nov. 2004) (AR 58-69) . . . . . . . . . . . . . . . . . . . . . . . passim

Gulf Landing Project, Deepwater Port Application, p. 2-5 (Oct. 2003) (AR 9)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,8, 19

Letter from Bonnie Braganza, EPA, Acting Chief Planning & Coordination to
Mark A. Prescott, Commandant, U.S. Coast Guard, p. 1 (Dec. 28, 2004) (AR 88)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Letter from Dwight Landreneau, Sec'y, La. Dep't of Wildlife & Fisheries to the
U.S. Dep't of Transp., p. 1 (Dec. 28, 2004) (AR 74) . . . . . . . . . . . . . . . . . . 21, 28

Letter from Governor Kathleen Blanco to the John Jamain, Acting Maritime
Adm'r, Marine Admin., U.S. Dep't of Transp., p.2  (Feb. 15, 2005) (AR 96)  . 9, 15

Letter from Julie Morris, Council Chairman, Gulf of Mexico Fishery Mgmt.
Council to U.S. Dep't of Transp. (Dec. 28, 2004) (AR 70) . . . . . . . . . . . . . 22, 27

Letter from Larry B. Simpson, Executive Dir., Gulf States Marine Fisheries
Comm'n to Mr. James Connaughton, Chairman, Council on Envtl. Quality, p. 2
(Jan. 28, 2005) (AR 94) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Letter from Larry B. Simpson, Executive Dir., Gulf States Marine Fisheries
Comm'n to U.S. Dep't of Transp., p. 3 (Dec. 28, 2004) (AR 71) . . . . . . 22, 27, 28

Letter from M.A. Prescott, Commander, U.S. Coast Guard to Larry Jensen,
Director Regulatory Affairs, Shell Gas Transmission, LLC (Jan. 2, 2004) (AR 13)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Letter from Mark Prescott, Chief of the Deepwater Ports Standards Division, U.S.
Coast Guard to Miles Croom, Assistant Regional Adm'r, NMFS, Habitat
Conservation Div., p. 3 (Feb. 7, 2005) (AR 93) . . . . . . . . . . . . . . . . . . . . . . . 10

Letter from Miles M. Croom, Assistant Reg'l Adm'r, Habitat Conservation
Division, National Marine Fisheries Service, Southeast Reg'l Office to Lieutenant
Derek Dostie, U.S. Dep't of Transp., p. 7 (Aug. 4, 2004) (AR 39) . . . . . . . . . . 3, 6

Letter from Susan Kennedy, Acting NEPA Coordinator, NMFS, to Mark A.
Prescott, U.S. Dep't of Transp., p. 1 (Jan. 3 2005) (AR 76) . . . 9-12, 15, 21, 26, 27

The Secretary's Decision on The Deepwater Port Application of Gulf Landing,
LLC, p. 8 (Feb. 16, 2005) (AR 95) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5-7

## STATEMENT OF THE ISSUES

The issues presented for review to this Court are as follows:

1.      Did the U.S. Secretary of Transportation violate the National Environmental Policy Act by failing to consider reasonably foreseeable cumulative impacts on fisheries and other important marine resources from Liquified Natural Gas facilities located in the Gulf of Mexico with approved licenses or for which the Secretary had received applications when he granted Gulf Landing's license?

2.      Did the U.S. Secretary of Transportation violate the  Deepwater Port Act by issuing a license for a Liquified Natural Gas facility that does not require the "best available technology, so as to prevent or minimize adverse impact on the marine environment" but instead uses a technology that the Secretary admits will have a higher effect on water quality and marine life than other available technology?

## STATEMENT OF JURISDICTION

The Deepwater Port Act provides that any person aggrieved by the

Secretary of Transportation's licensing decision may seek judicial review within

60 days:

> Any person suffering legal wrong, or who is adversely
> affected or aggrieved by the Secretary's decision to
> issue, transfer, modify, renew, suspend, or revoke a
> license may, not later than 60 days after any such
> decision is made, seek judicial review of such decision in
> the United States Court of Appeals for the circuit within
> which the nearest adjacent coastal State is located.

33 U.S.C. § 1516.

In this case, Louisiana is the nearest adjacent coastal state, The Secretary's

Decision on The Deepwater Port Application of Gulf Landing, LLC ("Gulf

Landing Decision"), p. 8 (Feb. 16, 2005) (AR 95),[1] and Petitioners filed within 60

days after the Decision on April 15, 2005, and thus this Court has jurisdiction.[2]

---

[1] On July 14, 2005, the U.S. Secretary of Transportation filed the Administrative
Record in this case.  Cites to documents in the Administrative Record will be to
the document name, page number, and date followed by the number of the
document in the Administrative Record.

[2] The Petitioners allege a violation of the Deepwater Port Act as well as a violation
of the National Environmental Policy Act.  Courts have interpreted jurisdictional
provisions similar to that of the Deepwater Port Act to require that Petitioners
bring all direct and collateral challenges to a license in Circuit Court instead of as
separate actions in District Court.  *See, e.g., Cal. Save Our Streams Council, Inc.
v. Yeutter*, 887 F.2d 908, 910-12 (9th Cir. 1989) (finding that Petitioners'
independent NEPA claims were subject to the Federal Power Act jurisdictional
provision); *City of Tacoma v. Nat'l Marine Fisheries Serv.*, 383 F. Supp. 2d 89,

## STATEMENT OF THE CASE

This case is an appeal of the U.S. Secretary of Transportation's decision to issue a deepwater port license to Gulf Landing LLC in contravention of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331-4335, and the Deepwater Port Act, 33 U.S.C. §§ 1501-1524. In making his decision, the Secretary violated NEPA by failing to consider reasonably foreseeable cumulative impacts and violated the Deepwater Port Act by failing to require that Gulf Landing "will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment." 33 U.S.C. § 1503(c). These failures are especially significant because Gulf Landing is located in the "'fertile fisheries crescent', the most biologically productive area in the Gulf of Mexico marine ecosystem." Letter from Miles M. Croom, Assistant Reg'l Adm'r, Habitat Conservation Division, National Marine Fisheries Service ("NMFS"),[3] Southeast Reg'l Office to Lieutenant Derek Dostie, U.S. Dep't of Transp. ("Aug. 2004 NMFS Letter"), p. 7 (Aug. 4, 2004) (AR 39).

---

91-93 (D.D.C. 2005) (dismissing for lack of jurisdiction a challenge under the Endangered Species Act as a collateral attack on a Federal Energy Regulatory Commission license); *Idaho Rivers United v. Foss*, 373 F. Supp. 2d 1158, 1160-61 (D. Idaho 2005) (same).

[3] NMFS is now known as NOAA Fisheries. To avoid confusion, Petitioners use the name "NMFS" throughout.

Under the Deepwater Port Act, the U.S. Secretary of Transportation[4] has

365 days after receiving an application for a natural gas port to issue a decision on

the application. 33 U.S.C. § 1504(c)(1), (e)(2), (g), (i)(1).[5]  During this time

period, he must take various steps, including conducting an environmental review

under NEPA and holding a public hearing.  *Id.* § 1504(f), (g).

On November 3, 2003, the Secretary determined that Gulf Landing had filed

a complete application for a deepwater port Liquified Natural Gas ("LNG")

facility off the coast of Louisiana.  Letter from M.A. Prescott, Commander, U.S.

Coast Guard to Larry Jensen, Director Regulatory Affairs, Shell Gas

Transmission, LLC (Jan. 2, 2004) (AR 13).  As required by the Deepwater Port

Act and NEPA, the Secretary published a notice of availability of the Draft

Environmental Impact statement on June 25, 2004, 69 Fed. Reg. 35,655, 35,655

(June 25, 2004) (AR 26), and completed the Final Environmental Impact

Statement in November 2004.  Final Environmental Impact Statement for the Gulf

---

[4] The Secretary of Transportation delegated this authority to issue licenses to the
Maritime Administrator, 49 C.F.R. § 1.66(aa)(1)-(2), and has also delegated
authority for various license processing tasks to the U.S. Coast Guard.  *See* 33
C.F.R. § 148.3.  Because this is delegated authority and the Secretary is
responsible under the Act, this brief refers to actions by the Maritime
Administrator and Coast Guard as actions by the Secretary.

[5] The Act contains several deadlines for various actions that combine to give the
Secretary 365 days.  33 U.S.C. § 1504(c)(1), (e)(2), (g), (i)(1).  The deadlines are
not at issue in this case.

Landing LLC Deepwater Port License Application ("Final EIS") (Nov. 2004) (AR

58-69).[6]  On February 16, 2005, the Secretary granted Gulf Landing's license

application. Gulf Landing Decision, p. 5 (AR 95).

In granting the license, the Secretary (1) violated NEPA by failing to

examine reasonably foreseeable cumulative environmental impacts from LNG

facilities in the Gulf of Mexico with approved licenses or for which the Secretary

had received applications at the time he made his decision[7] and (2) violated the

Deepwater Port Act by allowing Gulf Landing to use a system to warm the natural

gas that has a higher impact to fisheries and the marine environment than other

available technologies.  Thus, the Secretary granted Gulf Landing a license to

operate a facility that harms fisheries despite available alternatives that would

reduce those impacts and without full information on the reasonably foreseeable

cumulative impacts that will result from facilities in the Gulf of Mexico that

propose to use the same inadequate technology.

_____

[6] The Final EIS is dated November 2004 but was published on December 3, 2004.
Final EIS (AR 58).

[7] The Secretary also failed  to examine the impacts from construction of the
deepwater port. *See* Letter from Bonnie Braganza, EPA, Acting Chief Planning &
Coordination to Mark A. Prescott, Commandant, U.S. Coast Guard, p. 1 (Dec. 28,
2004) (AR 88).  At this time, Petitioners do not challenge this improper
segmentation because the EPA will not issue a Clean Water Act permit until the
Secretary completes a supplemental EIS.  *Id.*  If the Secretary fails to complete the
supplemental EIS, the license would be invalid on that basis as well.

## STATEMENT OF FACTS

On February 16, 2005, the U.S. Secretary of Transportation issued Gulf Landing LLC a license to operate a deepwater port 38 miles south of the coast of Cameron, Louisiana.  Gulf Landing Decision, p. 4 (AR 95).  The facility will receive, store, and regasify LNG.  Final EIS, p. 2-1 (AR 59).  LNG is natural gas cooled to a liquid at -160 degrees Celsius, which allows the gas to be shipped further than is practical with a pipeline.  Gulf Landing Project, Deepwater Port Application, p. 2-5 (Oct. 2003) (AR 9).

At the time the Secretary published the Final EIS for Gulf Landing, the Secretary had issued issued a license or had received applications for six LNG facilities in the Gulf of Mexico.  Final EIS, pp. 5-1 to 5-2 (AR 62).  Gulf Landing, "as well as several other proposed or permitted LNG terminals, are located in the 'fertile fisheries crescent', *the most biologically productive area in the Gulf of Mexico marine ecosystem*."  August 2004 NMFS Letter, p. 7 (AR 39) (emphasis added).

The Gulf Landing deepwater port will be located in 55 feet of water and "[t]he terminal will consist of two [gravity based units] fixed to the seabed, which will include . . . . two integral LNG storage tanks . . . . LNG will be vaporized utilizing open rack vaporizers . . . ."  Gulf Landing Decision, p. 5 (AR 95).  This is known as an "open loop" system.  "The open rack vaporizers heat the LNG by

exchanging heat with seawater. Seawater is pumped to the top of each open rack

vaporizer and flows down the outside of the panels. High pressure LNG flows

upward through tubes inside the panels and is warmed to convert the LNG back

into natural gas." *Id.* A "closed loop" system, on the other hand, burns natural gas

to heat water, which in turn heats the LNG. Final EIS, p. 2-6 (AR 59). The closed

loop system has less impact on fisheries than the open loop systems, *id.* at 2-10,

Table 2-1, but decreases profits[8] because it uses natural gas to vaporize the LNG.

*Id.*

Because open loop systems require the uptake and release of seawater, they

have significant impacts on the marine environment, including impingement and

entrainment of fish eggs and larvae, decreased water temperature, and the need for

an anti-biofouling agent, such as sodium hypochlorite. Final EIS, pp. 4-5, 4-37 to

4-38 (AR 61). Gulf Landing's application described these impacts:

> Entrainment and the associated phenomenon of
> impingement (the retention of larger fishes and other
> organisms on screens placed across the intakes) are
> considered significant impacts in projects that draw
> natural waters into a system for thermal alterations.
> Entrainment generally affects smaller sized organisms
> including planktonic eggs and larvae of fishes and
> invertebrates. Once drawn into the system, entrained

---

[8] The Secretary details how much a closed loop system would cost, Final EIS, p. 2-7, but fails to include numbers about the projected profit from the Gulf Landing facility. Without this number, it is impossible to put the cost of a closed loop system into perspective.

> organisms are subjected to mechanical damage by
> physical contact with pipes screens, pumps, and other
> components. In addition chemical (sodium hypochlorite)
> treatment to retard biofouling within the intake system
> will present a toxicity challenge to entrained organisms.
> Entrainment of fish eggs and larvae can be a significant
> source of mortality and possibly affect local populations
> in coastal and enclosed estuarine environments where
> volumes of plankton and larvae are high.

Gulf Landing Application, p. 4-33 (AR 11).

Because it uses an open loop system, the Gulf Landing facility alone could

destroy the equivalent of 3.8% of Louisiana's annual red drum fish harvest, Final

EIS for Gulf Landing Erratum, p. 5 (AR 90), and have unknown but potentially

severe impacts on other commercially critical Louisiana fisheries, including

shrimp. According to the Gulf States Marine Fisheries Commission, "these

impacts may be small, but cumulatively could be very substantial": "Other

economically important species like brown shrimp, white shrimp, gray triggerfish,

Spanish mackerel, cobia, dolphin, vermilion snapper, lane snapper, greater

amberjack, lesser amberjack, bluefish, little tunny, and king mackerel will also be

impacted. Individually these impacts may be small, ***but cumulatively could be***

***very substantial***." Letter from Larry B. Simpson, Executive Dir., Gulf States

Marine Fisheries Comm'n to Mr. James Connaughton, Chairman, Council on

Envtl. Quality ("Jan. 2005 Gulf States Marine Fisheries Comm'n Letter"), p. 2

(Jan. 28, 2005) (AR 94) (emphasis added). In addition, the facility will have

adverse impacts on sea turtles, marine mammals, and birds from increased noise

and an increased risk of oil spills.  Final EIS, pp. 4-26 to 4-37 (AR 61).

Before issuing a license for a deepwater port, the Secretary must prepare an

Environmental Impact Statement in compliance with NEPA.  33 U.S.C. § 1504(f).

During the NEPA process for Gulf Landing, the National Marine Fisheries Service

found that the Secretary had made his decision without "adequately evaluat[ing]"

cumulative impacts from other facilities.  Letter from Susan Kennedy, Acting

NEPA Coordinator, NMFS, to Mark A. Prescott, U.S. Dep't of Transp. ("Jan.

2005 NMFS Letter"), p. 1 (Jan. 3 2005) (AR 76) ("Furthermore, NMFS remains

concerned about the potential for significant cumulative fishery impacts resulting

from multiple LNG facilities proposed in the Gulf of Mexico. These possible

impacts were not adequately evaluated either in the draft or final EIS."); *see also*

Letter from Governor Kathleen Blanco to the John Jamain, Acting Maritime

Adm'r, Marine Admin., U.S. Dep't of Transp., p.2  ("Feb. 2005 Governor Blanco

Letter") (Feb. 15, 2005) (AR 96) ("The level of uncertainty in determining the

effects of the open rack vaporizer *is not acceptable*.  A comprehensive evaluation

incorporating existing data and additional data must be developed.  Part of this

evaluation should include an assessment of the cumulative impacts of the

numerous open rack vaporizers proposed for the Gulf of Mexico.") (emphasis in

original).

9

The National Marine Fisheries Service also stated that the open loop system was not the "more environmentally responsible action": "As we have consistently stated in our previous comments on this project, we are convinced that the use of a submerged combustion vaporizer (SCV), or closed-loop heating system, would greatly reduce ecological impacts and yield a stronger, more environmentally responsible action."  Jan. 2005 NMFS Letter, Enc., p. 3 (AR 76); *see also* Jan. 2005 Gulf States Marine Fisheries Comm'n Letter, pp. 2-3 (AR 94) ("Adverse marine fishery impacts can easily be rectified if a submerged combustion vaporizer (closed loop) system is required.").

In spite of the expert agencies' opinions, the Secretary authorized Gulf Landing to use an open loop system.  Letter from Mark Prescott, Chief of the Deepwater Ports Standards Division, U.S. Coast Guard to Miles Croom, Assistant Regional Adm'r, NMFS, Habitat Conservation Div., p. 3 (Feb. 7, 2005) (AR 93).

## SUMMARY OF ARGUMENT

The Secretary granted Gulf Landing's license under the Deepwater Port Act without complying with NEPA or the Deepwater Port Act.  Instead, the Secretary ignored the repeated opinions of expert marine resource agencies that (1) the Secretary did not consider the reasonably foreseeable cumulative impacts from LNG facilities proposed for the Gulf of Mexico as required to make an informed decision and (2) the Secretary had failed to require the "best available technology,

10

so as to prevent or minimize adverse impact on the marine environment." 33 U.S.C. § 1503(c)(5). This failure externalized "costs to other sectors, including commercial and recreational fisheries and the general public" and the decision could have "the possible result that statutorily required rebuilding targets [for fisheries] may be reached much later than anticipated or, in some instances, never." Jan. 2005 NMFS Letter, Enc., pp. 4, 2 (AR 76).

At the time the Secretary issued the Gulf Landing license, he had approved licenses or had received applications for six LNG facilities in the northern Gulf of Mexico. Final EIS, p. 5-1 to 5-2 (AR 62). The Secretary, however, only considered cumulative impacts from two other LNG facilities. The Secretary's justifications for excluding the other three facilities are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). Thus, the Secretary issued the license without preparing an adequate Environmental Impact Statement as required by NEPA. 42 U.S.C. § 4332(2)(C) (requiring an Environmental Impact Statement for "major Federal actions significantly affecting the quality of the human environment") and 40 C.F.R. § 1508.7 (requiring federal agencies to consider cumulative impacts from "past, present, and reasonably foreseeable future actions").

In addition, the Secretary violated the Deepwater Port Act's mandate "that . . . the deepwater port will be constructed and operated using best available

technology, so as to prevent or minimize adverse impact on the marine

environment." 33 U.S.C. § 1503(c)(5). Instead, the Secretary authorized Gulf

Landing to use open loop technology despite his admission that the open loop

system will have a "higher effect" on the marine environment than a closed loop

system, Final EIS for Gulf Landing, p. 2-10 (AR 59) and the opinion by the

National Marine Fisheries Service "that the use of a submerged combustion

vaporizer (SCV), or closed-loop heating system, would greatly reduce ecological

impacts and yield a stronger, more environmentally responsible action." Jan. 2005

NMFS Letter, Enc., p. 3  (AR 76). The Secretary's decision to allow an open loop

system despite the availability of technology that would have fewer impacts on the

marine environment is "contrary to law." 5 U.S.C. § 706(a)(2).

Because of the Secretary's failure to comply with NEPA and the Deepwater

Port Act, Petitioners respectfully request that the Court vacate and remand the

license back to the Secretary with instructions to examine all reasonably

foreseeable cumulative impacts and to require that the Gulf Landing use the "best

available technology, so as to prevent or minimize adverse impact on the marine

environment." 33 U.S.C. § 1503(c)(5).

# ARGUMENT

## I.    STANDARD OF REVIEW

Under the Administrative Procedures Act, a reviewing court will hold

"unlawful and set aside" any "agency action, findings, and conclusions" that are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(a).  A court reviews the agency action to "ensure that the

agency 'considered the relevant factors and articulated a rational connection

between the facts found and the choice made.'"  *Sierra Club v. U.S. Fish &*

*Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (quoting *Baltimore Gas & Elec.*

*Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983)).

Under NEPA, an EIS must satisfy three criteria: (1) the "agency in good

faith objectively has taken a hard look at the environmental consequences of a

proposed action and alternatives;" (2) the "EIS provides detail sufficient to allow

those who did not participate in its preparation to understand and consider

pertinent environmental influences involved;" and (3) the "EIS explanation of

alternatives is sufficient to permit a reasoned choice among different courses of

action."  *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir.

2000) (citing *Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 646

F.2d 215, 220 (5th Cir. 1981)).  Further, the underlying conclusions of the EIS

"must be supported by evidence in the administrative record."  *Id.* at 174-75.

II.    **THE SECRETARY VIOLATED NEPA BY FAILING TO EXAMINE REASONABLY FORESEEABLE CUMULATIVE IMPACTS FROM OTHER GULF OF MEXICO LNG FACILITIES.**

In the Gulf Landing Final EIS, the Secretary of Transportation included a cumulative impacts analysis but limited his review in two ways that violate NEPA.[9]   First, the cumulative impacts analysis "only include[d] Deepwater Port Applications that have been deemed complete by the [U.S. Coast Guard] and that have an approved public Draft NEPA document available for review at the time of the Draft EIS for Gulf Landing."  Final EIS, p. 5-1 (AR 62).  The Final EIS provides the following justification for this limitation:  "It would not be reasonable to speculate on the quantitative or qualitative configurations of an application until an approved public draft evaluation was available for review."  *Id*.  Thus, "the assessment of cumulative impacts associated with the Gulf Landing proposal will encompass two other proposed ports . . . ."  *Id.*[10]  The Secretary then excluded

_____

[9]The Secretary also limited his analysis to "the expected service life of the Port, an estimated 30 years."  Final EIS for Gulf Landing, p. 5.1 (AR 62).  Petitioners do not challenge that aspect of the Secretary's cumulative impacts analysis.

[10]  The Secretary included a proposal by Port Pelican LLC for a gravity-based-based structure platform  and a proposal by El Paso Energy Bridge Gulf of Mexico LLC for a submerged turret loading system in West Cameron.  Final EIS, p. 5-1 to 5-2 (AR 62).  He excluded proposals for which he had received applications from Freeport McMoRan for reuse of an existing structure for storage and regasification and for construction of caverns in an underlying salt dome for storage of regasified natural gas, Conoco Phillips for a gravity-based structure platform, and ExxonMobil for a gravity-based platform.  *Id.*

14

cumulative impacts from three other proposed ports.  The Secretary's justification,

however, makes no sense because the Deepwater Port Act requires detailed

information in applications, including the proposed location, type, and design.  33

U.S.C. § 1504(c)(2)(D), (E).  Thus, examining cumulative impacts from proposed

ports for which he had received applications would have required no speculation.

Second, the Secretary limited the analysis spatially:

> The spatial area would exceed the immediate footprint of
> the proposed Terminal and rights-of-way for the five
> take-away pipelines, and be limited to the Northwestern
> [Gulf of Mexico Outer Continental Shelf] and directly
> affected shore areas west of the Mississippi River
> discharge plume.  The Mississippi River discharge plume
> is approximately 210 miles east of the proposed Port and,
> in this case, represents a reasonable biological boundary
> for assessment of cumulative impacts.

Final EIS, p. 5-1 (AR 62).[11]  However, the Administrative Record provides no

support for this limitation and state and federal marine resource agencies

advocated that the Secretary consider cumulative impacts from all proposed open

loop systems in the Gulf.  *See* Jan. 2005 NMFS Letter, p. 1 (AR 76) ("NMFS

remains concerned about the potential for significant cumulative fishery impacts

resulting from multiple LNG facilities proposed in the Gulf of Mexico. These

possible impacts were not adequately evaluated either in the draft or final EIS.");

---

[11] This limitation excludes the Freeport McMoRan proposal and the Conoco
Phillips proposal.

Jan. 2005 Governor Blanco Letter, p. 2 (AR 96) (finding that the Secretary had not adequately studied risk from an open loop system and that "[p]art of this evaluation should include an assessment of the cumulative impacts of the numerous open rack vaporizers proposed for the Gulf of Mexico.").

The Secretary's omission of impacts from three proposed LNG facilities violates NEPA's goal of ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council, Inc.*, 490 U.S. 332, 349 (1989). Thus, the Secretary does not have full information and cumulative environmental impacts could be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* His failure was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a).

A.    **NEPA Requires That The Secretary Examine Cumulative Impacts From "Past, Present, And Reasonably Foreseeable Future Actions."**

NEPA requires that all federal agencies prepare an Environmental Impact Statement prior to taking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Environmental Impact Statement must include a "detailed statement" of "the environmental impacts of the proposed action." 40 U.S.C. § 4332. Impacts include "ecological, aesthetic,

16

historic, cultural, economic, social, or health, whether direct, indirect or

*cumulative*." 40 C.F.R. § 1508.8 (emphasis added). NEPA's implementing

regulations define "cumulative impact" to include past, present and future actions:

> the impact on the environment which results from the
> incremental impact of the action when added to other
> past, present, and reasonably foreseeable future actions
> regardless of what agency (Federal or non-Federal) or
> person undertakes such other actions. Cumulative
> impacts can result from individually minor but
> collectively significant actions taking place over a period
> of time.

40 C.F.R. § 1508.7.

> In analyzing cumulative impacts, an agency should consider:

> (1) the area in which effects of the proposed project will be felt;
> (2) the impacts that are expected in that area from the proposed
> project; (3) other actions–past, proposed, and reasonably
> foreseeable–that have had or are expected to have impacts in
> the same area; (4) the impacts or expected impacts from these
> other actions; and (5) the overall impact that can be expected if
> the individual impacts are allowed to accumulate.

*Fritiofson v. Alexander*, 772 F.2d 1225, 1236 (5th Cir. 1985) *abrogated on other*

*grounds by Sabine River Authority v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir.

1992).

"An impact is 'reasonably foreseeable' if it is 'sufficiently likely to occur

that a person of ordinary prudence would take it into account in reaching a

decision.'"  *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005)

(quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).

**B.     The Secretary Violated NEPA By Failing To Examine Reasonably Foreseeable Cumulative Impacts From  LNG Ports In The Gulf of Mexico.**

      *1.     The Secretary's justification for excluding deepwater ports for which he had received applications but without draft NEPA documents is arbitrary and capricious because the Deepwater Port Act requires detailed information in the application.*

The Secretary's only justification for excluding proposed LNG deepwater

ports with applications submitted to the Secretary but without a draft NEPA

document is that "it would not be reasonable to speculate."  Final EIS for Gulf

Landing, p. 5-1 (AR 62).  The Secretary's explanation does not hold water in light

of the detailed requirements for applications in the Deepwater Port Act.

Specifically, the Deepwater Port act requires that applications must provide:

      (D) **the proposed location and capacity** of the deepwater port, including all components thereof;

      (E) **the type and design of all components of the deepwater port and any storage facilities associated with the deepwater port**;

      (F) with respect to construction in phases, a detailed description of each phase, including anticipated dates of completion for each of the specific components thereof;

      (G) the location and capacity of existing and proposed storage facilities and pipelines which will store or transport oil transported through the deepwater port, to the extent known by the applicant or any person required

18

to be disclosed pursuant to subparagraphs (A), (B), or
(C) of this paragraph;

. . .

(K) a description of procedures to be used in
constructing, operating, and maintaining the deepwater
port, including systems of oil spill prevention,
containment, and cleanup; and

(L) such other information as may be required by the
Secretary to determine the environmental impact of the
proposed deepwater port.

33 U.S.C. § 1504(c)(2) (emphasis added); *see, e.g.*, Gulf Landing Application (AR

1-11) (setting forth detailed information about the proposed Gulf Landing Project).

Thus, the Secretary knew "the proposed location," and "the type and design

of all components" for three proposed Gulf of Mexico LNG ports but excluded

impacts from those ports from the cumulative impacts analysis. These were

concrete proposals for which the Secretary has sufficient information to analyze

impacts to the marine environment. The Secretary would not have been required

to "speculate" but instead to use the information in front of him. Instead, he

turned a blind eye to potential impacts from those ports. In addition given the

expense entailed with preparing such detailed applications, they are "'sufficiently

likely to occur that a person of ordinary prudence would take [them] into account

in reaching a decision.'" *City of Shoreacres v. Waterworth*, 420 F.3d at 453

(quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).

In short, the Secretary's explanation for excluding the facilities with filed

applications "runs counter to the evidence before the agency, *Motor Vehicle Mfr.*

*Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

> 2.     *The Secretary acted arbitrarily and capriciously by excluding*
> *ports east of the Mississippi River plume.*

The only justification for excluding proposed ports east of the Mississippi

River plume is that the plume "represents a reasonable biological boundary." *Id.*

However, the Secretary offers no support for this conclusion and it runs contrary

to comments by the National Marine Fisheries Service.  Specifically, the National

Marine Fisheries Service expressed concern about impacts from **all** of the facilities

in the Gulf of Mexico:

> In addition to potential individual impacts associated
> with the proposed Gulf Landing deepwater port, the
> NMFS remains concerned about the potential for
> cumulative fishery impacts resulting from a number of
> LNG facilities proposed in the Gulf of Mexico.
> According to the FEIS, the cumulative impacts resulting
> from operation of this facility in conjunction with two
> other [open loop] licensed facilities offshore of
> Louisiana could more than double the potential impacts
> to red drum.  Other marine resources would suffer
> similar levels of increased cumulative impacts.
> Furthermore, license applications for at least three other
> LNG facilities, in addition to the three proposals
> considered in the FEIS, each proposing to utilize
> between 100 and 250 million gallons of seawater per day
> for regasification, are in various stages planning and
> development in offshore waters of the northern Gulf of
> Mexico.  Authorization of an LNG terminal using an

[open loop] system, when the potential for adverse impacts to marine fishery resources appears to be high, would be precedent-setting for future decision-making by USCG/MARAD. ***If licensed and constructed, these six (or more) facilities would cause potentially severe cumulative impacts to marine fishery resources from entrainment, impingement, temperature change, and chemical additives.***

Jan. 2005 NMFS Letter, Enc., pp. 6-7 (AR 76) (emphasis added) .

Despite the urging of the National Marine Fisheries Service to thoroughly examine cumulative impacts, the Secretary arbitrarily excluded two proposed ports because of their location.

3.    *The Secretary's failure to examine cumulative impacts makes the Final EIS invalid.*

The Secretary excluded cumulative impacts from three proposed Gulf of Mexico LNG facilities for which he had received applications despite the fact that National Marine Fisheries Service,[12] the Louisiana Department of Wildlife and Fisheries,[13] the Gulf States Marine Fisheries Commission,[14] and the Gulf of

---

[12] Jan. 2005 NMFS Letter, p. 1 (AR 76) ("Furthermore, NMFS remains concerned about the potential for significant cumulative fishery impacts resulting from multiple LNG facilities proposed in the Gulf of Mexico. These possible impacts were not adequately evaluated either in the draft or final EIS.").

[13] Letter from Dwight Landreneau, Sec'y, La. Dep't of Wildlife & Fisheries to the U.S. Dep't of Transp. ("Dec. 2004 La. Dept't of Wildlife & Fisheries Letter"), p. 1 (Dec. 28, 2004) (AR 74) ("Our primary concern with the proposed plan is the unknown effect of the open rack vaporizer regasification system on populations of important marine species, particularly considering the number of license applications for this type of facility being currently considered by the USCG

Mexico Fishery Management Council[15] all expressed concern that the Secretary

had not considered all reasonably foreseeable cumulative impacts and about the

effect those impacts will have on the marine environment.  However, the Secretary

refused to examine cumulative impacts as required by NEPA and thus the

Secretary relied on an invalid EIS in making his licensing decision.  Because the

Secretary violated both NEPA and the Deepwater Port Act's requirement that the

Secretary comply with NEPA, 33 U.S.C. § 1504(f), the license must be vacated

and remanded to the Secretary.

---

across the Gulf of Mexico.").

[14] Letter from Larry B. Simpson, Executive Dir., Gulf States Marine Fisheries
Comm'n to U.S. Dep't of Transp. ("Dec. 2004 Gulf States Marine Fisheries
Comm'n Letter"), p. 3 (Dec. 28, 2004) (AR 71) ("The costs to the public also grow
when the cumulative impacts of other LNG facilities using [open loop systems]
nearby are considered.").

[15] Letter from Julie Morris, Council Chairman, Gulf of Mexico Fishery Mgmt.
Council to U.S. Dep't of Transp. ("Dec. 2004 Gulf of Mexico Fishery Mgmt.
Letter"), p. 3 (Dec. 28, 2004) (AR 70) ("The costs to the public also grow when
the cumulative impacts of other LNG facilities using [open loop systems] nearby
are considered.").

**III.  THE SECRETARY VIOLATED THE DEEPWATER PORT ACT BY FAILING TO REQUIRE THAT THE GULF LANDING FACILITY USE A CLOSED LOOP SYSTEM, WHICH IS "THE BEST AVAILABLE  TECHNOLOGY [] TO PREVENT OR MINIMIZE ADVERSE IMPACT ON THE MARINE ENVIRONMENT."**

The Secretary failed to comply with the Deepwater Port Act by allowing the Gulf Landing facility to use an open loop system despite the alternative of closed loop systems, which are technologies that would "prevent or minimize adverse impact on the marine environment."  33 U.S.C. § 1503(c).

Under the Deepwater Port Act, the Secretary "may issue a license" for a deepwater port if, among other conditions:

> (3) He determines that the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality;
> . . .
> (5) He determines, in accordance with the environmental review criteria established pursuant to section 1505 of this title, *that the applicant has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment*;
> . . .

33 U.S.C. § 1503(c) (emphasis added).  The Secretary's implementing regulations also provide that the application must use "the best available technology to prevent or minimize adverse impact on the environment."  33 C.F.R. §

148.710(1)(2).  The regulations instruct the Secretary to evaluate "a deepwater

port proposal and reasonable alternatives . . . on the basis of how well they":

> (a) Reflect the use of ***best available technology*** in
> design, construction procedures, operations, and decommissioning;
> . . .
> (g) ***Avoid interference with biotic populations,***
> ***especially breeding habitats*** or migration routes.

33 C.F.R. § 148.725 (emphasis added).

In this case, the Secretary failed to use the "best available technology, so as

to prevent or minimize adverse impact on the marine environment" given that the

Secretary admitted that the open loop system will have a "higher effect" on the

"water quality and marine life" than a closed loop system, Final EIS for Gulf

Landing, p. 2-10 (AR 59) and the decision is contrary to the opinions of marine

resource agencies.  *See infra* III.A.  Further, as set out above, the Secretary failed

to examine reasonably foreseeable cumulative impacts from facilities with

approved licenses or for which the Secretary had received a license application,

meaning that the Secretary's determination of "best available technology" was not

based on full information about impacts to the marine environment.  Thus, the

Secretary's decision is "contrary to law," 5 U.S.C. § 706(2)(a), and this Court must

remand the decision to the Secretary to issue a decision that complies with the

Deepwater Port Act.

### A.     The Secretary Admitted That The Open Loop System Has A Higher Effect On "Water Quality And Marine Life."

The Deepwater Port Act specifically requires that Gulf Landing be "constructed and operated using best available technology, so as to prevent or minimize adverse impact on the *marine environment*."  33 U.S.C. § 1503(c)(5) (emphasis added).  When the Secretary compared effects between open loop and closed loop systems, he admitted that open loop systems will have a "higher effect" on "water quality and marine life."  Final EIS for Gulf Landing, p. 2-10 (AR 59).  Yet, the Secretary allowed Gulf Landing to use open loop technology.

The Secretary's justifications for allowing a higher effect on the marine environment were reliability and cost:

> The Applicant selected [open loop] technology because it is a widely used and highly proven technology, is a simple process (highly reliable), and has low fuel-usage requirements and resultant reduced operating costs. The Applicant has also made sound arguments on the basis of safety and availability of means to ensure protection of the environment.

Final EIS, p. 2-11 (AR 59).  Thus, the Secretary's decision thus rests on factors other than impacts on the marine environment as required by the Deepwater Port Act.  Although he attempts to mask this conclusion by referencing "means to ensure protection of the environment," *id.*, he had already admitted that an open loop system will have "higher effects" on the marine environment.  *Id.* at 2-10.

25

**B.     The Expert Agencies In Marine Fisheries Found That A Closed Loop System Was "The Best Available Technology, So As To Prevent Or Minimize Adverse Impact On The Marine Environment."**

The National Marine Fisheries Service stated that the Secretary's decision to allow an open loop system was not the "more environmentally responsible action":

> While we appreciate the cooperation of the USCG/MARAD in using the improved impact assessment methodology (see FINAL EIS, Appendix G) developed in conjunction with the NMFS, we strongly disagree that the results of the assessment support the USCG/MARAD's conclusion that impacts to marine fishery species would not be significant. As we have consistently stated in our previous comments on this project, *we are convinced that the use of a submerged combustion vaporizer (SCV), or closed-loop heating system, would greatly reduce ecological impacts and yield a stronger, more environmentally responsible action*.

Jan. 2005 NMFS Letter, Enc., p. 3 (AR 76) (emphasis added).

The National Marine Fisheries Service went on to state that the Secretary's decision was based on Gulf Landing's "determination, based largely on the added cost savings of [open loop] systems":

> Other vaporization technologies were eliminated from detailed consideration even though they would eliminate the need for costly marine life exclusion systems, as well as the use of anti-biofouling agents, extensive monitoring, and remedial measures based on monitoring results. Use of [closed loop systems] or similar technologies also would reduce or eliminate significant costs associated with reduced fishery production and the

26

> reduction in non-use and ecosystem values, An [open
> loop] alternative would externalize these costs to other
> sectors, including commercial and recreational fisheries
> and the general public.

*Id.* at 4. Thus, according to the National Marine Fisheries Service, the Secretary
did not require Gulf Landing to use "the best available technology for the marine
environment," but instead allowed Gulf Landing to use a technology that would
save it money but pass "these costs to . . . the public." *Id.*

The National Marine Fisheries Service was not the only resource agency
that stated that a closed system would have fewer impacts on the marine
environment than an open loop system. The Gulf of Mexico Fishery Management
Council and the Gulf States Marine Fisheries Commission both stated that the
open loop system will " have unacceptable negative impacts on fishery stocks in
the Gulf of Mexico" and was based on cost:

> In light of the above information, the
> [Commission/Council] feels that the proposed use of an
> [open loop system] will have unacceptable negative
> impacts on fishery stocks in the Gulf of Mexico. The
> Commission feels that [a closed loop system] should
> have been fully analyzed in the FINAL EIS in order to
> fulfill National Environmental Policy Act (NEPA)
> requirements. ***The only real justification given for not
> fully analyzing the use of [a closed loop system] was
> operational cost.***

Dec. 2004 Gulf States Marine Fisheries Comm'n Letter p. 3 (AR 71); Dec. 2004

Gulf of Mexico Fishery Mgmt. Council (AR 70) (emphasis added).

The Commission and Council went on to describe their assessments of the

impacts to fisheries:

> If an [open loop system] is employed instead of [closed
> loop system], the operational cost will be borne by the
> public in the loss of and impact to important commercial
> and recreational fish stocks. By examining the impacts to
> the red drum fishery in Louisiana alone, the cost to Gulf
> Landing LLC associated with operating [a closed loop
> system] are comparable to the cost to the public if Gulf
> Landing LLC is allowed to operate the facility with an
> [open loop system]. While it has not been quantified,
> another associated cost is the destruction of billions or
> fish eggs, larvae; and other planktonic organisms that
> would be lost due to the entrainment, temperature
> change, and chemical additives used to prevent
> biofouling in the [open loop system]. The loss of these
> organisms may have adverse effects on ecosystem health
> by reducing the availability of forage and prey species
> and by affecting benthic habitat and sessile organisms in
> the project area.

*Id.*; *see also* December 2004 La. Dep't of Wildlife & Fisheries Letter, p. 1 (AR 74)

("Current estimates include wide ranges of potential impacts on important fishery

species, including the potential for substantial impacts to red drum fisheries.

These estimates do not address other important fishery species such as winter and

spring spawning finfish species and invertebrates like brown and white shrimp and

blue crabs.").

Thus, according to expert agencies in marine fisheries the Secretary's

decision to violate the Deepwater Port Act will have serious impacts to Gulf of

Mexico fisheries and pass costs on to the marine environment and the public.

**C.     The Secretary Failure To Examine Reasonably Foreseeable Cumulative Impacts Skewed His Decision With Respect To The Best Available Technology For The Marine Environment.**

The marine resource agencies repeatedly expressed their opinion that open

loop systems in the Gulf of Mexico will have adverse impacts on the marine

environment and that the Secretary's decision to allow the system will pass on

costs to the public.  *See supra* III.B.  In ignoring these opinions and authorizing an

open loop system for Gulf Landing, the Secretary had incomplete information

about cumulative impacts from other proposed open loop systems in the northern

Gulf of Mexico.  Without this information, the Secretary's assumptions about

impacts to the marine environment have no basis.  Therefore, the Secretary must

examine reasonably foreseeable cumulative impacts before setting the precedent of

allowing a technology that will result in adverse impacts to Gulf of Mexico

fisheries.  Until he does so, he has not "'considered the relevant factors and

articulated a rational connection between the facts found and the choice made.'"

*Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001)

(quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*,

462 U.S. 87, 105 (1983)).

29

## IV.    Petitioners Have Standing to Prosecute this Regulatory Appeal.

Associations such as the Petitioners have "standing to bring a suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000), (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

The Petitioners in this case are three organizations that work to protect the fisheries and other environmental resources of the Gulf of Mexico.  The Gulf Restoration Network "is a network of environmental, social justice, and citizens' groups and individuals committed to restoring the Gulf of Mexico to an ecologically and biologically sustainable condition."  Declaration of Cynthia Sarthou, ¶ 2.  The Sierra Club Delta Chapter's primary purpose is "to promote the conservation and protection of the environment in Louisiana and the Gulf of Mexico." Declaration of Maura Wood, ¶ 2.  And the Louisiana Charter Boat Association has as an "overall goal of protecting the Gulf of Mexico's fisheries." Declaration of Charlie Smith, ¶ 4.[16]  Thus, the Secretary's licensing decisions has

_____

[16] Due to Hurricane Katrina, Petitioners' Counsel has not been able to obtain signed declarations for Louisiana Charter Boat Association Executive Director Charlie Smith, Gulf Restoration Network member Lawrence McAlpine, or

impacts on the resources these organizations seek to protect and, as explained below, all of the requirements for standing are met in this case.

**A.     Individual Petitioner Members Have Standing.**

At least one of an association's members must meet the Court's test for individual standing by showing "that: (1) they have suffered an actual or threatened injury; (2) the injury is 'fairly traceable' to the defendant's actions; and (3) the injury will likely be redressed if the plaintiffs prevail in the lawsuit." *Crown*, 207 F.3d at 792 (citations omitted).

*1.     Petitioners' Members Have Suffered an Injury-in-Fact.*

Gulf Restoration Network member Lawrence McAlpine and Sierra Club member Michael Corn have both fished off the Gulf Coast of Louisiana numerous times and intend to do so as soon again as the Gulf Coast is accessible. Declaration of Lawrence McAlpine, ¶ 3; Declaration of Michael Corn, ¶ 3.[17] They are concerned about the impact on Gulf Coast fisheries from open loop LNG facilities and their ability to use and enjoy the Gulf for fishing. Declaration of

---

Louisiana Charter Boat member Poppa Joe Bush by the due date for the Original Brief. In its Motion For An Order to Submit Standing Declarations, Counsel requests leave to submit signed declarations for Charlie Smith, Lawrence McAlpine, and Poppa Joe Bush by October 17, 2005. Unsigned declarations for Charlie Smith and Lawrence McAlpine were submitted with the motion.

[17] These arguments are also applicable to Louisiana Charter Boat Association member Poppa Joe Bush and will be documented in his declaration.

Lawrence McAlpine, ¶ 4; Declaration of Michael Corn, ¶ 4. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 183 (2000). Thus, Mr. McAlpine and Mr. Corn have suffered injury-in-fact from he Secretary's licensing decision, which will impact fisheries and lessen the "recreational value[]" of the northern Gulf of Mexico for them.

> 2.    *The Injury Is Fairly Traceable to the U.S. Department of Transportation's Action.*

The "fairly traceable" element of standing focuses on the link between the U.S. Department of Transportation's conduct and Petitioners' injuries. Here, the Secretary authorized the use of a technology that marine resource agencies have stated will impact Gulf of Mexico fisheries. Without the Secretary's license, Gulf Landing could not build an open loop LNG facility, which threatens Gulf of Mexico fisheries and thus threatens Mr. Corn's and Mr. McAlpine's recreational fishing interests.

> 3.    *The Injury is Redressable by this Court.*

Under the Deepwater Port Act and the Administrative Procedure Act, this Court has full authority to vacate and remand the licensing decision by the

Secretary to require him to examine cumulative impacts and require "the best available technology, so as to prevent or minimize adverse impact on the marine environment." 33 U.S.C. § 1503(c)(5).

### B.      This Proceeding is Germane to Petitioners' Purposes.

The three Petitioners organizations seek to protect the fisheries and environment of the Gulf of Mexico. Declaration of Cyn Sarthou, ¶ 2; Declaration of Maura Wood, ¶ 2; Declaration of Charlie Smith, ¶ 4. The Secretary's licensing decision impacts precisely these resources, including fisheries and marine life. Thus, challenging the Secretary's decision is directly related to the Petitioners' purposes.

### C.      The Proceeding Does Not Require Individual Participation.

Petitioners do not seek money damages or particularized relief limited to a single person or group. Thus, this action does not require the participation of individuals and may be brought by organizations.

## CONCLUSION

Because the U.S. Secretary of Transportation's license decision violated the

National Environmental Policy Act and the Deepwater Port Act, Petitioners

respectfully request that Gulf Landing's license be vacated and remanded for

proceedings in accordance with the Court's decision.

Respectfully Submitted this 10th day of October, 2005,

TULANE ENVIRONMENTAL LAW CLINIC

_____

Karla Raettig (La. Bar No. 27860)
Counsel for Petitioners Gulf Restoration Network, Sierra
Club, and Louisiana Charter Boat Association
6329 Freret Street
New Orleans, LA 70118
Tel: (504) 865-5789
Fax: (504) 862-8721
Contact Information Until October 31:
5633 SE Schiller
Portland, OR 97206
(504) 452-3156

CERTIFICATE OF SERVICE

I, Karla Raettig, certify that today, October 10, 2005, two copies of the Original Brief for Petitioners, in paper and computer disk formats were served by Federal Express to:


Todd Kim
Appellate Division
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 23795 L'Enfant Station
Washington, D.C. 20026

Warren W. Harris
Bracewell & Giuliani LLP
711 Louisiana St, Suite 2300
Houston, TX  77002-2770

David A. Savage
Baker Botts L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, TX  78701


_____
Karla Raettig (La. Bar No. 27860)
Counsel for Petitioners
6329 Freret Street
New Orleans, LA 70118
Tel: (504) 865-5789
Fax: (504) 862-8721
Contact Information Until October 31:
5633 SE Schiller
Portland, OR 97206
(504) 452-3156

# CERTIFICATE OF COMPLIANCE

Pursuant to 5TH CIR. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5TH CIR. R. 32.2.7(b).

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5TH CIR. R. 32.2.7(b)3, THE BRIEF CONTAINS:

    7720 words

2. THE BRIEF HAS BEEN PREPARED:
    in proportionally spaced typeface using:
    WordPerfect 9.0
    in Times New Roman 14 pt

3. IF THE COURT SO REQUESTS, THE UNDERSIGNED WILL PROVIDE AN ELECTRONIC VERSION OF THE BRIEF AND/OR A COPY OF THE WORD OR LINE PRINTOUT.

4. THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5TH CIR. R. 32.2.7, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

                                       _____

                                       Karla Raettig