No. 05-60321

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

GULF RESTORATION NETWORK; SIERRA CLUB;
LOUISIANA CHARTER BOAT ASSOCIATION,
Petitioners,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
Respondent,

and

GULF LANDING LLC; CONOCOPHILLIPS COMPANY;
COMPASS PORT LLC; BEACON PORT LLC,
Intervenors.

ON PETITION FOR REVIEW OF AN ORDER OF
THE UNITED STATES DEPARTMENT OF TRANSPORTATION

**BRIEF OF RESPONDENT
UNITED STATES DEPARTMENT OF TRANSPORTATION**

KELLY A. JOHNSON
Acting Assistant Attorney General

JOHN A. BRYSON
TODD S. KIM
Attorneys, U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 23795 (L'Enfant Plaza Station)
Washington, D.C. 20026
(202) 514-2762

## STATEMENT REGARDING ORAL ARGUMENT

Respondent agrees with petitioners that oral argument in this case would be beneficial and thus requests oral argument.

# TABLE OF CONTENTS

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Statutory and regulatory background . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . 2

        2.    Deepwater Port Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Factual and procedural background . . . . . . . . . . . . . . . . . . . . . . . . 8

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    I.    THE ADMINISTRATOR COMPLIED WITH NEPA . . . . . . . . . 18

        A.    Cumulative Impacts Analyses Need Not Include
                Speculation About the Effects of All Future Actions
                That Agencies Potentially May Take But Have
                Not Proposed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B.    The Administrator Reasonably Declined to Speculate
                About Other Potential Projects Based Merely on
                the Completion of an Application . . . . . . . . . . . . . . . . . . . . 22

            1.    Information gathering . . . . . . . . . . . . . . . . . . . . . . . . 23

            2.    Discretion to deny a license or impose conditions . . 24

            3.    Other Deepwater Port Act requirements . . . . . . . . . 26

-ii-

4.    Licensing versus actual construction  . . . . . . . . . . . .  26

5.    Reasonableness  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

C.    Even if the Cumulative Impacts Analysis Could Have
Been Broader, the Administrator Took a Hard Look
at Cumulative Impacts  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

D.    Applicable Precedent Demonstrates That the
Administrator Complied with NEPA  . . . . . . . . . . . . . . . . .  31

II.    THE ADMINISTRATOR COMPLIED WITH THE
DEEPWATER PORT ACT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

A.    This Court Should Defer to the Administrator's
Statutory Interpretation, Which Is Both Consistent with
the Deepwater Port Act and Reasonable  . . . . . . . . . . . . . .  33

1.    *Chevron* step one  . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

2.    *Chevron* step two  . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

B.    Petitioners Do Not Claim That the Administrator's
Decision Was Arbitrary or Capricious on Its Merits  . . . . . .  41

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

# TABLE OF AUTHORITIES

## CASES:

*Airport Impact Relief v. Wykle*, 192 F.3d 197 (1st Cir. 1999) . . . . . . . . . .  20, 21

*Am. Petroleum Inst. v. EPA*, 787 F.2d 965 (5th Cir. 1986) . . . . . . . . . . . . . . .  40

*Atlanta Coal. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333 (5th Cir. 1979) . . . . . .  21

*Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897 (5th Cir. 1983) . . .  15, 43

*Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87
    (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 15, 43

*BCCA Appeal Group v. EPA*, 355 F.3d 817 (5th Cir. 2003) . . . . . . . . . . . . . . . 15

*Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) . . . . . .  passim

*Citizens Against Burlington v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) . . . . . . . .  30

*City of Riverview v. Surf. Transp. Bd.*, 398 F.3d 434 (6th Cir. 2005) . . . . . . . .  21

*City of Shoreacres v. Waterworth*, 420 F.3d 440 (5th Cir. 2005) . . . . . . . .  passim

*Coal. on Sensible Transp. v. Dole*, 826 F.2d 60 (D.C. Cir. 1987) . . . . . . . . . . .  22

*County of Suffolk v. Sec'y of the Interior*, 562 F.2d 1368 (2d Cir. 1977) . . . . .  20

*Custer County Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) . . . . . .  30

*Deukmejian v. NRC*, 751 F.2d 1287 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . 20

*Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . .  21

*George E. Warren Corp. v. EPA*, 159 F.3d 616 (D.C. Cir. 1998) . . . . . . . . . . .  37

*In re Tex. Mortgage Servs.*, 761 F.2d 1068 (5th Cir. 1985) . . . . . . . . . . . . .  37, 41

*Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) . . . . . . . . . . . . .  4

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . .  19, 20, 21

*Limerick Ecology Action v. NRC*, 869 F.2d 719 (3d Cir. 1989) . . . . . . . . . . . . 20

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989) . . . . . . . . . . . . . .  2

*Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . .  37

*Miss. River Basin Alliance v. Westphal*, 230 F.3d 170 (5th Cir. 2000) . . . .  passim

*Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998) . . . . .  5

*Natural Res. Def. Council v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) . . . . . . . . .  37

*Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471 (D.C. Cir. 1990) . . . . . . . . . . . .  21

*Piedmont Heights Civic Club v. Moreland*, 637 F.2d 430 (5th Cir. 1981) .  21, 30

*Presidio Golf Club v. NPS*, 155 F.3d 1153 (9th Cir. 1998) . . . . . . . . . . . . . . . .  20

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) . . . . .  2, 3, 20

*S. La. Envtl. Council v. Sand*, 629 F.2d 1005 (5th Cir. 1980) . . . . . . . . . . .  21, 31

*Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669
    (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 20, 21

*Sierra Club v. EPA*, 314 F.3d 735 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 37
*Sierra Club v. Glickman*, 67 F.3d 90 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 14
*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 20
*Sierra Club v. Morton*, 510 F.2d 813 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . 30
*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168 (3d Cir. 2000) . . . 21
*Spiller v. White*, 352 F.3d 235 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 2, 3
*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) . . . . . . . . . . . . . . . . 16
*United States v. Mead*, 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . 15
*United States v. Menendez*, 48 F.3d 1401 (5th Cir. 1995) . . . . . . . . . . . . . . . 14
*Vermont Yankee Nuclear Power v. Natural Res. Def. Council*,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 20
*Vieux Carre Prop. Owners v. Pierce*, 719 F.2d 1272 (5th Cir. 1983) . . 20, 21, 32
*Webb v. Gorsuch*, 699 F.2d 157 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES, RULES, AND REGULATIONS:

Administrative Procedure Act

5 U.S.C. 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
5 U.S.C. 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
5 U.S.C. 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
5 U.S.C. 706(2)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 42

Deepwater Port Act

33 U.S.C. 1501–1524 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
33 U.S.C. 1501(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 39
33 U.S.C. 1501(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 40
33 U.S.C. 1501(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 39
33 U.S.C. 1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
33 U.S.C. 1502(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
33 U.S.C. 1502(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
33 U.S.C. 1503(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
33 U.S.C. 1503(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 33
33 U.S.C. 1503(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 41
33 U.S.C. 1503(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35, 36, 41

33 U.S.C. 1503(c)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26
33 U.S.C. 1503(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25
33 U.S.C. 1503(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
33 U.S.C. 1503(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
33 U.S.C. 1504(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23
33 U.S.C. 1504(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6, 7, 28
33 U.S.C. 1504(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5, 6, 22
33 U.S.C. 1504(e)–(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6, 7, 24, 28
33 U.S.C. 1504(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25
33 U.S.C. 1504(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7, 28
33 U.S.C. 1504(i)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7
33 U.S.C. 1505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6, 36
33 U.S.C. 1507(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
33 U.S.C. 1514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
33 U.S.C. 1515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
33 U.S.C. 1516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

National Environmental Policy Act

42 U.S.C. 4321–4370f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2
42 U.S.C. 4332(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

33 C.F.R. 148.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9
33 C.F.R. 148.105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
33 C.F.R. 148.107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23
33 C.F.R. 148.108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23
33 C.F.R. 148.222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6
33 C.F.R. 148.227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6
33 C.F.R. 148.276(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7, 28
33 C.F.R. 148.279 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7
33 C.F.R. 148.320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
33 C.F.R. 148.700 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7
33 C.F.R. 148.705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7, 36
33 C.F.R. 148.707 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7
33 C.F.R. 148.710(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8, 39
33 C.F.R. 148.720 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7, 8
33 C.F.R. 148.725(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

33 C.F.R. 148.730 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
33 C.F.R. 148.735 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 36
33 C.F.R. 148.737 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. pt. 1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
40 C.F.R. 1502.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
40 C.F.R. 1502.2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
40 C.F.R. 1502.13–16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
40 C.F.R. 1506.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
40 C.F.R. 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19
40 C.F.R. 1508.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
40 C.F.R. 1508.8(a)–(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

69 Fed. Reg. 9348 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
69 Fed. Reg. 35,655 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
69 Fed. Reg. 70,270 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
70 Fed. Reg. 7288 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
70 Fed. Reg. 35,277 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
70 Fed. Reg. 57,885 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## STATEMENT OF ISSUES

Petitioners seek review of a decision of the Maritime Administrator ("Administrator"), under authority delegated to him by the Secretary of Transportation ("Secretary"), to license a liquified natural gas ("LNG") facility in the Gulf of Mexico under the Deepwater Port Act.  The issues are:

1. Whether the Administrator acted arbitrarily or capriciously in concluding that the effects of certain potential future projects in the Gulf of Mexico were too speculative to consider in evaluating the cumulative impact of this licensing decision under the National Environmental Policy Act ("NEPA"); and

2. Whether petitioners are correct that the Deepwater Port Act unambiguously requires ports to use the technology that is best for the marine environment even if that technology is demonstrably inferior in other respects, including its effects on other aspects of the environment.

## STATEMENT OF THE CASE

In the order under review, the Administrator decided to grant a license to operate a facility in the Gulf of Mexico to receive liquified natural gas, regasify it, and deliver it into pre-existing pipelines for transport to the mainland.  He performed a full environmental impact statement under NEPA and analyzed the application pursuant to the rigorous procedural and substantive requirements in the Deepwater Port Act.  He also required the licensee to take numerous steps to

-1-

mitigate any adverse environmental impacts. Petitioners challenge the decision on

two narrow grounds: first, the scope of the cumulative impacts analysis under

NEPA; and second, the Administrator's decision not to require use of a regasifying

technology that was best for water quality and marine life (though inferior in every

other measured respect), in purported violation of the Deepwater Port Act.

###    A.    Statutory and regulatory background

1. <u>National Environmental Policy Act</u>. — The National Environmental

Policy Act, 42 U.S.C. 4321–4370f, requires federal agencies to examine the

environmental effects of proposed federal actions and to inform the public of the

environmental factors the agencies have considered. *Baltimore Gas & Elec. v.*

*Natural Res. Def. Council*, 462 U.S. 87, 97 (1983). NEPA is "strictly procedural"

and does not require an agency to act in the manner best for the environment. *City*

*of Shoreacres v. Waterworth*, 420 F.3d 440, 450 (5th Cir. 2005); see *Marsh v.*

*Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA does not work by

mandating that agencies achieve particular substantive environmental results.");

*Vermont Yankee Nuclear Power v. Natural Res. Def. Council*, 435 U.S. 519, 558

(1978); *Spiller v. White*, 352 F.3d 235, 238 (5th Cir. 2003) ("[NEPA] prescribes

adherence to a particular process, not the production of a particular result." (citing

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989))), *cert.*

*denied*, 125 S. Ct. 34 (2004). Its purpose is to "insure a fully-informed and well-

considered decision, not necessarily a decision the judges * * * would have

reached had they been members of the decisionmaking unit of the agency."

*Vermont Yankee*, 435 U.S. at 558. "NEPA merely prohibits uninformed — rather

than unwise — agency action." *Robertson*, 490 U.S. at 351; *Spiller*, 352 F.3d at

238.

If an agency proposes to undertake "a major Federal action[] significantly

affecting the quality of the human environment," NEPA requires the agency to

prepare an environmental impact statement ("EIS"). 42 U.S.C. 4332(C).

Regulations issued by the Council on Environmental Quality govern the

preparation of an EIS. 40 C.F.R. pt. 1502; see *Sabine River Auth. v. U.S. Dep't of

Interior*, 951 F.2d 669, 677 (5th Cir. 1992) (Council on Environmental Quality

regulations bind federal agencies). An EIS "shall provide full and fair discussion

of significant environmental impacts" but "shall be kept concise and shall be no

longer than absolutely necessary." 40 C.F.R. 1502.1, 1502.2(c). An EIS should

discuss the purpose of and need for the proposed project, reasonable alternatives,

the affected environment, and environmental consequences. 40 C.F.R.

1502.13–.16. An EIS must address both direct and indirect effects. 40 C.F.R.

1502.16(a)–(b); see 40 C.F.R. 1508.8(a)–(b).

Courts have concluded that an EIS must also include a discussion of

cumulative impacts.[1]/ *E.g.*, *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076

(9th Cir. 2002). "Cumulative impact" is defined as

> the impact on the environment which results from the incremental
> impact of the action when added to other past, present, and reasonably
> foreseeable future actions regardless of what agency (Federal or
> non-Federal) or person undertakes such other actions. Cumulative
> impacts can result from individually minor but collectively significant
> actions taking place over a period of time.

40 C.F.R. 1508.7.

This Court has set forth three considerations for determining the adequacy of

an EIS: "(1) whether the agency in good faith objectively has taken a hard look at

the environmental consequences of a proposed action and alternatives; (2) whether

the EIS provides detail sufficient to allow those who did not participate in its

preparation to understand and consider the pertinent environmental influences

involved; and (3) whether the EIS explanation of alternatives is sufficient to permit

a reasoned choice among different courses of action." *Miss. River Basin Alliance*

*v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000); see *City of Shoreacres*, 420 F.3d at

451 & n.9. "[T]his three-part test is applied under the highly deferential standard

of review set forth in the [Administrative Procedure Act ("APA")]." *Id.* at 451 n.9;

---

[1]/    NEPA and its implementing regulations do not explicitly require an EIS to
have such a discussion. Cf. 40 C.F.R. 1508.8 (defining "effects" to include various
types of effects "whether direct, indirect, or cumulative"), 1508.25(c)(3) (directing
agencies to consider cumulative impacts in determining an EIS's scope).

see *Miss. River Basin Alliance*, 230 F.3d at 174.  This Court "follow[s] a 'rule of reason' and 'a pragmatic standard which requires good faith objectivity but avoids 'fly specking.'"  *Id.* at 175 (quoting *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998)).

2. Deepwater Port Act. — A deepwater port is a "fixed or floating manmade structure other than a vessel * * * located beyond State seaward boundaries and * * * used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas for transportation to any State."  33 U.S.C. 1502(9).  In enacting the Deepwater Port Act, 33 U.S.C. 1501–1524, Congress announced purposes including to "authorize and regulate the location, ownership, construction, and operation" of deepwater ports; "provide for the protection of the marine and coastal environment to prevent or minimize any adverse impact which might occur as a consequence of the development of such ports;" and "promote the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States."  33 U.S.C. 1501(a)(1), (2), (5).

The Deepwater Port Act requires a license to own, construct, or operate a deepwater port.  33 U.S.C. 1503(a).  Those applying for licenses must provide the Secretary with financial, technical, and other information.  33 U.S.C. 1504(c)(2); 33 C.F.R. 148.105.  The required information includes "the proposed location and capacity of the deepwater port, including all components thereof;" "the type and

-5-

design of all components of the deepwater port and any storage facilities associated with the deepwater port;" "a description of procedures to be used in constructing, operating, and maintaining the deepwater port, including systems of oil spill prevention, containment, and cleanup;" and "such other information as may be required by the Secretary to determine the environmental impact of the proposed deepwater port." 33 U.S.C. 1504(c)(2). When the Secretary has received a complete application, he must publish notice and a summary of the application in the Federal Register, after which he must conduct any necessary NEPA review, consult with other federal agencies as appropriate, and hold a public hearing (or hearings) before issuing a decision on the application. 33 U.S.C. 1504(c)(1), (e)–(g); see 33 C.F.R. 148.222, .227.

The Secretary may issue a license if he determines that nine conditions are met. 33 U.S.C. 1503(c). As relevant here, these include that:

> (3) he determines that the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality;

> \* \* \*

> (5) he determines, in accordance with the environmental review criteria established pursuant to [33 U.S.C. 1505], that the applicant has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment;

(6) he has not been informed * * * by the Administrator of the Environmental Protection Agency [("EPA")] that the deepwater port will not conform with all applicable provisions of [certain environmental laws[2]]; [and]

\* \* \*

(8) the Governor of the adjacent coastal State or States * * * approves, or is presumed to approve, issuance of the license * * * .

*Id.*; 33 C.F.R. 148.279; see 33 U.S.C. 1502 (definitions of terms), 1508(b)(1) (Governor's approval presumed in the absence of timely disapproval). He generally will make a license decision within 356 days after receiving a complete application. 33 U.S.C. 1504(c)(1), (g), (i)(1), (4); 33 C.F.R. 148.276(a).

The Deepwater Port Act gives the Secretary general authority to issue regulations. 33 U.S.C. 1504(a). In addition, it directs the Secretary to establish and periodically review environmental criteria for use in reviewing applications. 33 U.S.C. 1505(a), (b). They apply to the fabrication, construction, operation, and decommissioning of ports and to related activities (such as the operations of vessels and onshore facilities that serve the port). 33 C.F.R. 148.705. The criteria cover all aspects of the environment (including the marine environment), oceanographic currents and wave patterns, and human health and welfare. 33 C.F.R. 148.707. Accordingly, the criteria for evaluation are numerous. 33 C.F.R.

---

[2] The applicant must also obtain permits from EPA and other agencies under other laws such as the Clean Air Act and the Clean Water Act. 33 C.F.R. 148.700; see 33 C.F.R. 148.737 (listing statutes applicants must follow).

148.720 (siting criteria), 148.725 (design, construction, and operational criteria),

148.730 (land use and coastal zone management criteria), 148.735 (other critical

criteria).  They include how well the application "[r]eflect[s] the use of best

available technology in design, construction procedures, operations, and

decommissioning."  33 C.F.R. 148.725(a); see 33 C.F.R. 148.710(a)(2) (applicant

must show that "the deepwater port will be fabricated, constructed, operated, and

decommissioned using the best available technology to prevent or minimize

adverse impact on the environment").

The Secretary may place conditions on a license to meet the requirements of

the Deepwater Port Act.  33 U.S.C. 1503(e)(1).  In addition, he may suspend or

revoke licenses for noncompliance, as well as seek equitable relief or civil or

criminal penalties for violations.  33 U.S.C. 1503(h), 1507(c), 1514; 33 C.F.R.

148.320; see also 33 U.S.C. 1515 (citizen suits).  Those aggrieved by the

Secretary's license decisions may in certain circumstances seek review via

petitions in the appropriate court of appeals.  33 U.S.C. 1516.

## B.     Factual and procedural background

Gulf Landing LLC submitted an application for a deepwater port license and

supplemental information on November 3 and December 12, 2003.  Administrative

Record ("AR") 1–11 (application), 15–16 (supplements); AR 95 (Secretary's

Decision), at 4.  Gulf Landing seeks to operate a port in the Gulf of Mexico, about

38 miles south of Cameron, Louisiana, in water depth of about 55 feet.  AR 10, at

2-12; AR 95, at 4.  It will receive vessels carrying LNG (natural gas that has been

liquified and kept at about −260°F), offload and store LNG, warm LNG to regasify

it, and deliver natural gas into existing offshore pipelines that supply the Gulf

Coast.  AR 10, at 2-15 to 2-16; AR 95, at 4–5.  The port will be able to deliver up

to 1.2 billion standard cubic feet per day of natural gas into the pipeline system.

AR 10, at 2-21; AR 95, at 4.  Total capital expenditures during construction are

expected to be about $700 million.  AR 95, at 4.

On January 22, 2004, the Maritime Administration ("MarAd") and the

United States Coast Guard published a notice in the Federal Register announcing

and summarizing the application and inviting comment.[3]  69 Fed. Reg. 3165

(2004) (AR 12).  On February 27, 2004, these agencies announced their intent to

prepare an EIS, requested comment on its scope, and invited the public to an open

house for information on the application.  69 Fed. Reg. 9348 (2004) (AR 18).  EPA

and NOAA Fisheries[4] provided comments.  AR 23, 25.  On June 25, 2004, MarAd

and the Coast Guard announced the availability of a draft EIS for review and again

solicited public comment.  69 Fed. Reg. 35,655 (2004) (AR 26).  The draft EIS

_____

[3]     The Secretary has delegated his authority under the Deepwater Port Act to
the Maritime Administrator and the Coast Guard.  33 C.F.R. 148.3.

[4]     NOAA Fisheries was previously known as the National Marine Fisheries
Service and is part of the National Oceanic and Atmospheric Administration.

presented detailed descriptions of the project, alternatives, the affected

environment, and environmental consequences of the project including cumulative

impacts. AR 29–38. One individual and various state and federal agencies

commented. AR 39, 42–45, 47, 49–51. In addition, MarAd and the Coast Guard

held public meetings in Lafayette and New Orleans, Louisiana, on July 15 and

November 18, 2004, to receive further comments. AR 40, 81 (transcripts).

MarAd and the Coast Guard announced the availability of the final EIS on

December 3, 2004. 69 Fed. Reg. 70,270 (2004) (AR 57). The 297-page EIS

provides an exhaustive discussion of the project's purpose and need, the project as

proposed and alternatives (including the alternative of taking no action), the

affected environment, and consequences to that environment from the alternatives.

AR 58–62. The EIS considers effects spanning the port's entire life cycle,

including onshore construction, installation, at-sea construction, operation, and

decommissioning. AR 59. The areas of environmental consideration include water

quality, biological resources (including marine mammals, sea turtles, seabirds and

migratory birds, and fisheries and essential fish habitat), cultural resources,

geological resources, socioeconomics, recreation, transportation, air quality, and

noise. AR 60–62. The appendices include responses to comments on the draft EIS

and voluminous technical information. AR 63–69.

Of particular concern here, the EIS describes and discusses two different

technologies for regasifying LNG: the open-rack vaporizer ("ORV") and

submerged combustion vaporizer ("SCV") technologies.  AR 59, at 2-6 to 2-11,

2-41.  ORV involves the intake of seawater to warm LNG (with the result that the

released seawater is slightly colder) and SCV uses the combustion of natural gas to

heat water in a closed loop.  AR 59, at 2-6 to 2-7.  As the EIS describes, ORV is

safer, more reliable, less expensive, and more energy-efficient, and it results in the

emission of less air pollution.  AR 59, at 2-7 to 2-11.  SCV has less of a direct

effect on marine life, given that it does not involve the intake of seawater, but the

EIS describes and analyzes ways to limit ORV's effects on marine life, including

minimizing the rate of seawater flow at intake, using screens designed to exclude

marine life, and placing the intake at the optimum depth.  AR 59, at 2-11 to 2-20.

The EIS recognizes that selection of a technology to vaporize LNG "depends on

case-by-case evaluation" but concludes that ORV is superior for this proposed

port.  AR 59, at 2-9, 2-11.

The EIS proceeds to analyze the effects of ORV in the various areas of

environmental consideration and finds minor adverse effects on offshore species

but no significant impacts on biological resources overall.  AR 61, at 4-5 to 4-9,

4-22 to 4-25, 4-28, 4-31, 4-33, 4-35, 4-37 to 4-50.  The EIS also lists monitoring

and other steps to be required as license conditions to mitigate adverse effects.  AR

-11-

61, at 4-56 to 4-57. Finally, the EIS considers the cumulative impacts of this proposed port in light of two other proposed ports and predicts a long-term but minor adverse impact on fisheries and essential fish habitat. AR 62, at 5-1 to 5-15. The EIS explains that the cumulative impacts analysis is limited to Deepwater Port Act projects with "approved public Draft NEPA document[s] available for review," as "[i]t would not be reasonable to speculate on the quantitative or qualitative configurations" of less mature applications. AR 62, at 5-1.

On February 16, 2005, after again receiving comments, AR 70–80, 86, 88, 92, 96, 98–101, the Administrator (acting under the Secretary's delegated authority) issued a decision granting the license subject to certain conditions. AR 95. He found that the application "meets the basic criteria in the [Deepwater Port] Act, but only subject to certain conditions designed to protect and advance the national interest, as well as conditions to preserve and enhance the environment." AR 95, at 5. He recognized his obligations to "ensure that the best available technology is utilized in the development of a facility that is environmentally sound, safe, and energy efficient" and to consider the "overall national interest." AR 95, at 10.

The Administrator found each of the conditions for issuance of a license satisfied. AR 95, at 10–24. He found that granting the license was in the national interest and consistent with other policy goals, such as energy sufficiency (in view

of the Nation's great and growing need for natural gas) and environmental

considerations.  AR 95, at 14–16.  With regard to the choice between ORV and

SCV, he stated: "As reflected in the Final EIS, I do not believe the ORV alternative

produces significant negative impacts, nor do I believe a closed loop vaporizing

system is a better alternative for this port" because "the costs to the environment,

the applicant and the economy associated with imposing [SCV] exceed the

benefits."  AR 95, at 15.  He reasoned:

> When compared to ORVs in the Gulf, [SCVs] are energy inefficient,
> consuming large amounts of natural gas and increasing the
> applicant['']s operating expenses by an estimated $20.8–$43.4 million
> per year * * * .  In addition, the burning of natural gas will add
> pollutants to the air far beyond what an ORV would produce.
> However, these costs would pale in comparison to the impact on the
> U.S. consumer and our economy should the imposition of this burden
> cause this and other applicants to delay or abandon the construction of
> natural gas infrastructure.

AR 95, at 15–16.  He recognized that "[t]he one area that ORV is not

environmentally preferable is in its effects on water quality and marine life" but

noted the "strong plan of prevention, monitoring and mitigation * * * developed to

minimize the impact, fully evaluate impacts of the deepwater port to the nation's

fisheries and mitigate negative impacts."  AR 95, at 16.  Thus, he "concluded that

Gulf Landing will contribute to an overall improvement in our economy and

environment."  AR 95, at 16.  He also concluded that, consistent with the analysis

in the EIS, Gulf Landing had demonstrated that it would operate the port using the

-13-

best available technology, and he explained conditions that the license would contain to ensure that impact on the environment would be minimized.  AR 95, at 19–22.  The license with conditions issued soon thereafter.  AR 100.

Gulf Restoration Network, Sierra Club, and Louisiana Charter Boat Association filed a petition for review with this Court on April 15, 2005.[5]  The Court permitted Gulf Landing and a group of other companies with interests in Deepwater Port Act licenses to intervene on behalf of respondent.

## STANDARD OF REVIEW

Because the Deepwater Port Act does not contain a standard of review, the Court should review the licensing decision at issue under the APA's deferential standard of review, as petitioners recognize.  Petitioners' Brief ("Pet. Br.") 13; see *United States v. Menendez*, 48 F.3d 1401, 1410 (5th Cir. 1995) ("Except as otherwise provided by law, the APA judicial review provisions apply to all federal agency actions unless a statute precludes judicial review or agency action is committed by law to agency discretion." (citing 5 U.S.C. 701)); cf. *Sierra Club v. Glickman*, 67 F.3d 90, 95 (5th Cir. 1995) (APA standard applies in review of agency action for compliance with Endangered Species Act).  A court engaging in APA review may consider whether an agency action is arbitrary, capricious, an

_____

[5]    Gulf Restoration Network and Sierra Club participated in the administrative proceedings, AR 72, 79–81, but Louisiana Charter Boat Association did not and thus is not a proper petitioner under the Deepwater Port Act. 33 U.S.C. 1516.

-14-

abuse of discretion, or otherwise not in accordance with the law and whether it is in

excess of statutory jurisdiction.  5 U.S.C. 706(2)(A), (C).  Review under the APA

is deferential, especially with regard to decisions informed by technical expertise.

*Baltimore Gas & Elec.*, 462 U.S. at 103; *Avoyelles Sportsmen's League v. Marsh*,

715 F.2d 897, 905 (5th Cir. 1983).  An agency's factual findings are conclusive if

supported by substantial evidence.  5 U.S.C. 706(2)(E).

Furthermore, because the Deepwater Port Act gives the Secretary authority

to issue regulations and to issue formal decisions on license applications, this Court

should review statutory interpretations embodied in regulations and formal orders

granting licenses under the deferential analysis announced in *Chevron, U.S.A. v.*

*Natural Res. Def. Council*, 467 U.S. 837 (1984).  See *United States v. Mead*, 533

U.S. 218, 229 (2001) ("We have recognized a very good indicator of delegation

meriting *Chevron* treatment in express congressional authorizations to engage in

the process of rulemaking or adjudication that produces regulations or rulings for

which deference is claimed."); *BCCA Appeal Group v. EPA*, 355 F.3d 817, 824–25

(5th Cir. 2003); cf. *Mead*, 533 U.S. at 234–35 (agency positions that do not receive

*Chevron* deference still receive respect under *Skidmore v. Swift & Co.*, 323 U.S.

134 (1944)).  Under the *Chevron* analysis, courts ask two questions:

> First, always, is the question whether Congress has directly spoken to
> the precise question at issue.  If the intent of Congress is clear, that is
> the end of the matter * * * .  If, however, the court determines

-15-

> Congress has not directly addressed the precise question at issue, the
> court does not simply impose its own construction on the statute, as
> would be necessary in the absence of an administrative interpretation.
> Rather, if the statute is silent or ambiguous with respect to the specific
> issue, the question for the court is whether the agency's answer is
> based on a permissible construction of the statute.

467 U.S. at 842–43 (citations omitted).  Similarly, an agency's interpretation of its

regulations controls unless it is plainly erroneous or inconsistent with the

regulatory text.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

## SUMMARY OF ARGUMENT

The petition for review should be denied.  Petitioners' arguments under

NEPA and the Deepwater Port Act are incorrect and fail to take into account the

deference due the Administrator's decision.

First, the Administrator complied with NEPA.  Petitioners argue that the EIS

underlying the decision was deficient in that the cumulative impacts analysis did

not include three potential projects for which Deepwater Port Act applications had

been filed.  Applicable regulations and precedent indicate, however, that

cumulative impact analyses need not include undue speculation about the effects of

uncertain future actions.  Petitioners' argument that a cumulative impacts analysis

must include every potential port for which an application has been filed supposes

that the Administrator must speculate on cumulative impacts without (1) engaging

in the process contemplated by the Deepwater Port Act to gather information to

-16-

verify and supplement the data the applicant submits; (2) considering whether he might exercise his discretion to require changes or even deny the application entirely; (3) accounting for the fact that EPA or the Governor of the adjacent State could disapprove the application whether or not the Administrator wishes to grant a license; and (4) recognizing that even a licensed port may never be built.  The Administrator acknowledges that some forecasting may be necessary in assessing cumulative impacts; indeed, the EIS indicates that it would consider the impacts of potential ports for which draft NEPA documents were available, whether or not administrative processes on such ports were complete.  Petitioners' arguments notwithstanding, this decision on where to draw the line is reasonable, not arbitrary or capricious.

Second, the Administrator complied with the Deepwater Port Act. Petitioners argue that the statute unambiguously requires the use of the technology that is best for the marine environment (without regard to other factors) and that the decision in question was contrary to law because the Administrator licensed a port with a technology for regasifying LNG with a higher effect on water quality and marine life than another technology.  Petitioners misunderstand the statute and fail to account for the deference due under the *Chevron* analysis to the Administrator's statutory interpretation.  Under the first step, the statutory language does not unambiguously require petitioners' construction of the "best

-17-

available technology" requirement but rather is consistent with the Administrator's construction.  Under the second step, the Administrator's statutory interpretation is reasonable given Congress' purposes and other provisions in the Deepwater Port Act.

## ARGUMENT

## I.    THE ADMINISTRATOR COMPLIED WITH NEPA.

Petitioners' argument under NEPA is meritless.  The cumulative impacts analysis in the EIS included the licensed project and two other projects west of the Mississippi River plume.  AR 62, at 5-1.  The EIS excluded from consideration three ports for which applications had been filed but draft NEPA documents were not yet available.[6]  AR 62, at 5-1.  The EIS explained: "It would not be reasonable to speculate on the quantitative or qualitative configurations of an application until an approved public draft evaluation was available for review."  AR 62, at 5-1.  Petitioners argue that this limitation was arbitrary or capricious.[7]  Pet. Br. 14–20.

---

[6]    The Gulf Landing EIS was finalized and published on December 3, 2004.  AR 58.  Draft EISs were made available for the three projects excluded from the cumulative impacts analysis on February 11, April 21, and June 17, 2005.  70 Fed. Reg. 7288 (2005); 70 Fed. Reg. 20,762 (2005); 70 Fed. Reg. 35,277 (2005).  The decision under review was issued on February 16, 2005.  AR 95.

[7]    Petitioners also argue that the EIS improperly indicated that it would exclude ports east of the Mississippi River's plume in the Gulf of Mexico.  Pet. Br. 20–22.  This argument applies to only two of the three potential ports that were excluded from the cumulative impacts analysis.  Pet. Br. 15 n.11; AR 62, at 5-1.  As we

(continued...)

To the contrary, this explanation was perfectly appropriate.  Because the

Administrator has taken a hard look at the environmental consequences of granting

the Gulf Landing license, the EIS is adequate.

### A. Cumulative Impacts Analyses Need Not Include Speculation About the Effects of All Future Actions That Agencies Potentially May Take But Have Not Proposed.

An agency's "obligation under NEPA to consider cumulative impacts is

confined to impacts that are 'reasonably foreseeable.'"  *City of Shoreacres*, 420

F.3d at 453 (quoting 40 C.F.R. 1508.7).  The precise scope of what is "reasonably

foreseeable" is not defined and is for the agency to determine in the first instance,

and that determination receives this Court's deference.  *Id.* at 453–54; *Kern*, 284

F.3d at 1079; *Miss. River Basin Alliance*, 230 F.3d at 176.

---

[7/](...continued)
explain in the text, however, all three were reasonably excluded from the analysis
for the independent reason that the proposals for these ports were not sufficiently
mature.  Thus, this Court need not reach the issue of whether these ports could also
have been excluded based on geography.  Cf. 5 U.S.C. 706 ("due account shall be
taken of the rule of prejudicial error" in APA review).  In any event, contrary to
petitioners' contention (Pet. Br. 15), the administrative record has evidence
indicating that the Mississippi River plume, 210 miles to the east of the proposed
project, is a "reasonable biological boundary" (AR 62, at 5-1).  *E.g.*, AR 60, at 3-4
to 3-5 (describing "dead zone" in this area), 3-29 (describing plume's effects on
icthyoplankton distribution); AR 61, at 4-23 (describing association of copepods
with plume); AR 62, at 7-9 (citing to observational study on plume); see *Kleppe v.
Sierra Club*, 427 U.S. 390, 414 (1976) ("[I]dentification of the geographic area
within which [cumulative impacts] may occur is a task assigned to the special
competency of the appropriate agencies.").

Federal agencies need not analyze overly speculative impacts under NEPA.

This Court recently explained:

> An impact is "reasonably foreseeable" if it is "sufficiently likely to
> occur that a person of ordinary prudence would take it into account in
> reaching a decision." "Reasonable foreseeability" does not include
> "highly speculative harms" that "distort[] the decisionmaking process"
> by emphasizing consequences beyond those of "greatest concern to
> the public and of greatest relevance to the agency's decision."

*City of Shoreacres*, 420 F.3d at 453 (quoting *Sierra Club v. Marsh*, 976 F.2d 763,

767 (1st Cir. 1992), and *Robertson*, 490 U.S. at 356); see also *Sabine River Auth.*,

951 F.2d at 680 ("environmental clairvoyance" not required); *Vieux Carre Prop.*

*Owners v. Pierce*, 719 F.2d 1272, 1278 (5th Cir. 1983); cf. *Vermont Yankee*, 435

U.S. at 551 ("Time and resources are simply too limited to hold that an [EIS] fails

because the agency failed to ferret out every possible alternative, regardless of how

uncommon or unknown that alternative may have been at the time the project was

approved."). Other courts of appeals have taken the same view.[9]

In particular, as the Supreme Court has confirmed, NEPA does not require

the agency "to consider the possible environmental impacts of less imminent

actions when preparing the impact statement on proposed actions." *Kleppe*, 427

---

[9]      *E.g.*, *Airport Impact Relief v. Wykle*, 192 F.3d 197, 206 (1st Cir. 1999);
*Presidio Golf Club v. NPS*, 155 F.3d 1153, 1163 (9th Cir. 1998); *Limerick Ecology
Action v. NRC*, 869 F.2d 719, 745 (3d Cir. 1989); *Deukmejian v. NRC*, 751 F.2d
1287, 1300 & n.63 (D.C. Cir. 1984), *aff'd in other part en banc*, 789 F.2d 26 (D.C.
Cir. 1986); *County of Suffolk v. Sec'y of the Interior*, 562 F.2d 1368, 1379 (2d Cir.
1977).

U.S. at 410 & n.20; see *Atlanta Coal. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333,

1343 & n.12 (5th Cir. 1979).  The cumulative impacts analysis should include

other agency actions that are sufficiently mature to be considered agency

"proposals" but need not include actions that are merely contemplated.  *Vieux*

*Carre Prop. Owners*, 719 F.2d at 1278; *Piedmont Heights Civic Club v. Moreland*,

637 F.2d 430, 441 (5th Cir. 1981); *S. La. Envtl. Council v. Sand*, 629 F.2d 1005,

1015 (5th Cir. 1980); see *Miss. River Basin Alliance*, 230 F.3d at 175–76 & n.6; cf.

40 C.F.R. 1508.23 (proposal exists when agency "has a goal and is actively

preparing to make a decision on one or more alternative means of accomplishing

that goal and the effect can be meaningfully evaluated"); *Fritiofson v. Alexander*,

772 F.2d 1225, 1245–47 (5th Cir. 1985) (considering cumulative impacts analysis

necessary in determination of whether to prepare an EIS at all), *abrogated in other*

*part*, *Sabine River Auth.*, 951 F.2d at 677.  Other courts have again agreed.[9]

The accepted rule accords with common sense, since the agency must draw a

line somewhere and will consider the cumulative impact of later actions in future

NEPA documents should any actions that are merely contemplated become full-

fledged proposals.  *Kleppe*, 427 U.S. at 410 n.20, 414 n.26; *S. La. Envtl. Council*,

---

[9]    *E.g.*, *City of Riverview v. Surf. Transp. Bd.*, 398 F.3d 434, 442 (6th Cir.
2005); *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 179–82 (3d Cir.
2000); *Airport Impact Relief*, 192 F.3d at 206; *Nat'l Wildlife Fed'n v. FERC*, 912
F.2d 1471, 1478 (D.C. Cir. 1990).

629 F.2d at 1016. "It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987); see *Webb v. Gorsuch*, 699 F.2d 157, 161 (4th Cir. 1983).

### B.    The Administrator Reasonably Declined to Speculate About Other Potential Projects Based Merely on the Completion of an Application.

Petitioners' argument that the Administrator had to analyze the cumulative impact of every potential deepwater port for which he had received an application (Pet. Br. 18–20) is contrary to these settled understandings of NEPA's requirements. As petitioners emphasize, license applications under the Deepwater Port Act must include technical information to allow the Administrator to determine the environmental impact of the port. 33 U.S.C. 1504(c)(2). That does not imply, however, that the mere completion of an application allows him to predict ultimate impacts with sufficient certainty. There are many remaining steps in the administrative process that affect what those impacts actually could be, and indeed whether the Administrator will even propose granting a license and a port will be built.

The Administrator recognizes that impacts need not be absolutely predictable to merit inclusion in a cumulative impacts analysis. Indeed, the EIS

indicates that it would consider the cumulative impacts of potential ports for which

draft NEPA documents were available, whether or not administrative processes on

such ports were complete.  AR 62, at 5-1.  The Administrator must, of course, draw

the line somewhere.  Even if the Administrator could have done so differently, as

petitioners contend, his decision in this EIS not to engage in all four of the

following layers of speculation is reasonable.

    1. <u>Information gathering</u>. — First, to accept petitioners' argument that the

Administrator must consider the cumulative impacts of any proposed project at the

mere filing of an application under the Deepwater Port Act, the Court would have

to presume that the information provided by the applicant itself is sufficient for

analysis.  Of course, the Administrator has an independent responsibility to assess

an application and cannot merely rubber-stamp an applicant's representations.  33

U.S.C. 1504(c) (Secretary may issue license if "he determines" conditions are

met); see 33 C.F.R. 148.107–.108 (procedures for requesting additional

information from applicant).  Indeed, the regulations implementing NEPA make

that explicit.  40 C.F.R. 1506.5(a) ("The agency shall independently evaluate the

information submitted and shall be responsible for its accuracy.").  Furthermore, in

recognition of the fact that a deepwater port application raises issues implicating

many agencies' expertise, the Deepwater Port Act requires the Administrator to

"forward a copy of such application to those Federal agencies and departments

with jurisdiction over any aspect of such ownership, construction, or operation for comment, review, or recommendation as to conditions." 33 U.S.C. 1504(e). The information-gathering process after the filing of an application is vital in assessing the environmental impact of a potential port. Petitioners, however, would have the Administrator speculate on that impact based solely on the applicant's own submission, an approach the Administrator judged to be potentially unreliable.

The importance of the process prescribed by the Deepwater Port Act is evident in the administrative record for the Gulf Landing license in particular. After Gulf Landing submitted its initial application, MarAd and the Coast Guard determined that the application lacked sufficient environmental review data and directed Gulf Landing to submit supplemental information. AR 13–14. In particular, MarAd and the Coast Guard noted that NOAA Fisheries had requested additional information relevant to the potential impact of the proposal on the marine environment. AR 14; see AR 19. Gulf Landing provided additional information for use in evaluating its proposal. AR 15–16, 24. Before a draft EIS was released, EPA and NOAA Fisheries provided still further comments to inform that evaluation. AR 23, 25. This process enabled the Administrator to gain critical information for evaluating Gulf Landing's application.

2. <u>Discretion to deny a license or impose conditions</u>. — Second, petitioners' argument ignores the fact that the Administrator in his discretion may decline to

grant a license entirely or may decide to grant a license only on particular conditions that may include changes to the applicant's proposal. 33 U.S.C. 1503(e), 1504(i). Petitioners apparently would require the Administrator to consider the effects of a potential project while ignoring that he has discretion to decide whether to license it as envisioned by the applicant, to license it in a changed form, or to deny a license completely.

Indeed, in granting Gulf Landing's license application, the Administrator made clear that the license would be issued "subject to certain conditions designed to protect and advance the national interest, as well as conditions to preserve and enhance the environment." AR 95, at 5. In particular, he imposed conditions including technical requirements regarding the ORV system (such as the depth of the intake, the intake screen mesh size, and intake velocity) and the establishment of a comprehensive prevention, monitoring, and mitigation plan in cooperation with NOAA Fisheries and other agencies. AR 95, at 19–22; see AR 100, at 13–17. Furthermore, the EIS for Gulf Landing emphasized that the "selection of means to vaporize LNG" — that is, ORV, SCV, or some other technology — "depends on case-by-case evaluation, to include consideration of how a given system's design and operating conditions would fit within the overall scheme of a project." AR 59, at 2-9. Even if an applicant proposes a port based on ORV (or any other particular technology), the Administrator retains discretion to require the use of a different

technology if he deems it necessary to satisfy the Deepwater Port Act's

requirements.  Evaluating the applicant's proposal without recognition of that

possibility, as petitioners contend NEPA requires, would thus require a second

layer of speculation.

     3. <u>Other Deepwater Port Act requirements</u>. — Third, even if the

Administrator accepted the applicant's proposal without need for independent

information-gathering and analysis and without requiring any changes, the license

still may not issue without satisfaction of conditions beyond the Administrator's

control.  He may not issue a license if EPA timely informs him that the deepwater

port will not conform with particular environmental statutes or if the Governor of

the adjacent State timely indicates disapproval.  33 U.S.C. 1503(c)(6), (8).  Neither

EPA nor the Governor of Louisiana so indicated in this instance (AR 95, at 22–24),

but that possibility remains in every license proceeding.  Indeed, the Governor

submitted a letter suggesting that she would in the future "oppose the licensing of

offshore LNG terminals that will use" ORV.  AR 146.  Whether or not she actually

exercises her authority under the Deepwater Port Act to disapprove such projects in

the future, the existence of that authority is further reason why assessing the

environmental impact of future deepwater ports is speculative.

     4. <u>Licensing versus actual construction</u>. — Fourth, even if a license is

issued, a port may never be built.  The license provides the right to construct a port

-26-

(if the licensee satisfies the license conditions) but no obligation to do so. Indeed, in the decision under review, the Administrator recognized that issuance of a license does not guarantee that a deepwater port will be built. AR 95, at 6. He stated:

> The[] conditions create special obligations with which the applicant must agree to comply. For this reason, Gulf Landing may decide not to accept the license and undertake the project. If not, then I hope other potential applicants will step forward. If Gulf Landing does accept these conditions and goes forward with the project, I am satisfied that the Port will be developed in a way that serves the public interest.

AR 95, at 6. Furthermore, construction of a deepwater port is quite expensive, and changes in market conditions can change a licensee's incentives. The chance that a licensed port may never be built introduces yet another element of speculation into any attempt to assess a port's impacts based solely on an application.[10]

5. Reasonableness. — Petitioners' view that the Administrator must engage in all of this speculation as a matter of NEPA law is unreasonable. Under petitioners' view, a license application filed the day before an EIS was published invariably would require treatment in the EIS. Such a rule would not only be unnecessarily inflexible, but also lead to delays that could make it difficult, if not impossible, for the Administrator to adhere to the short time limitations for making

---

[10]     Indeed, one of the licensed ports included in the cumulative impacts analysis has been delayed indefinitely. 70 Fed. Reg. 57,885 (2005) (announcing indefinite delay in onshore activities necessary for offshore facility construction).

the license decision under the Deepwater Port Act.  33 U.S.C. 1504(c)(1), (g), (i)(1), (4); 33 C.F.R. 148.276(a).

Again, the Administrator recognizes that some reasonable prediction is inherent in NEPA.  Thus, for instance, the EIS considered the cumulative impacts of two ports for which draft NEPA documents had been made available even though it remained to be seen, for instance, whether the licensees would actually construct those ports.  AR 62, at 5-1.  The question, however, is whether the Administrator acted reasonably in deciding in this case that it would go too far to speculate about the possible impacts of three potential projects for which he had received completed applications but for which draft NEPA documents were not available.  At most, petitioners show that the Administrator could have adopted a broader analysis, not that his determination was arbitrary or capricious.  Cf. *County of Suffolk*, 562 F.2d at 1379 ("While speculation in an EIS is not precluded, the agency is not obliged to engage in endless hypothesizing as to remote possibilities. There comes a point when the chain of 'ifs' gets too long and too tenuous to be of any practical use.").

**C.     Even if the Cumulative Impacts Analysis Could Have Been Broader, the Administrator Took a Hard Look at Cumulative Impacts.**

The Administrator engaged in a comprehensive assessment of cumulative impacts.  The EIS describes in detail the cumulative impacts of the license on water quality, biological resources, cultural resources, geological resources, socioeconomics, recreation, transportation, air quality, noise, and risk management.  AR 62, at 5-1 to 5-13.  Under the "rule of reason," this Court applies "a pragmatic standard which requires good faith objectivity but avoids 'fly specking.'"  *Miss. River Basin Alliance*, 230 F.3d at 175.  Despite petitioners' argument that the Administrator should have considered three additional potential deepwater ports in the cumulative impacts analysis, the Administrator has in good faith taken a "hard look" at the cumulative impacts of granting Gulf Landing a license and the EIS provides "detail sufficient * * * to understand and consider the pertinent environmental influences," and thus the EIS is adequate.  *Id.* at 174; see *City of Shoreacres*, 420 F.3d at 451 & n.9.

Even if the EIS had included consideration of the three projects upon which the Administrator declined to speculate, there is no compelling reason to believe the cumulative impacts analysis would have been different in any material way.  In particular, petitioners challenge the portion of the analysis regarding impacts on fisheries and essential fish habitat given that Gulf Landing's ORV system will

involve the intake of seawater.  Pet. Br. 1, 6–10.  Petitioners do not, however,

contest the conclusion in the EIS that the amount of seawater required by the ORV

system in Gulf Landing's port is about one percent of the seawater already being

used by existing shipping operations in the Gulf of Mexico.  AR 62, at 5-7.

The Administrator nevertheless proceeded to analyze the potential

cumulative impacts of the Gulf Landing port and two other proposed deepwater

ports and predicted a "long-term minor adverse impact on fisheries and [essential

fish habitat]."  AR 62, at 5-8 to 5-9.  Even assuming that the Administrator could

have included three more potential ports in the analysis, as petitioners contend, the

analysis he performed was a good-faith "hard look" at cumulative impacts and was

therefore adequate under NEPA.[11/]  Cf. *Sierra Club v. Morton*, 510 F.2d 813,

824–25 (5th Cir. 1975) (EIS discussion of cumulative impacts was adequate, even

if arguably incomplete, where criticisms "boil[ed] down to questioning the degree

of detail rather than the lack of it").

_____

[11/]     Petitioners note that some federal and state entities suggested in comments
that the Administrator should adopt a broader cumulative analysis.  Pet. Br. 9,
15–16, 20–21; *e.g.*, AR 76 (comments of NOAA Fisheries); AR 96 (letter from the
Governor of Louisiana).  The comments of other agencies that do not administer
NEPA are "not determinative."  *Piedmont Heights Civic Club*, 637 F.2d at 436 n.9.
The statute "requires agencies preparing environmental impact statements to
consider and respond to the comments of other agencies, not to agree with them."
*Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1038 (10th Cir. 2001); see
*Citizens Against Burlington v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991).

### D.     Applicable Precedent Demonstrates That the Administrator Complied with NEPA.

Finally, the conclusion that the Administrator satisfied NEPA here is consistent with applicable precedent in this Court.  Indeed, petitioners do not even attempt to compare this case with any other.  In *South Louisiana Environmental Council*, this Court addressed whether an agency properly considered cumulative impacts in an EIS for a navigation project.  629 F.2d at 1009–10, 1015–16.  The plaintiffs contended that the EIS should have accounted for the effects of a project the agency contemplated for flood protection.  *Id.* at 1015.  Although the Court acknowledged that "some type of flood protection will be necessary," the agency did not have to discuss the impacts of the project in question given that it was only one of several possible alternatives.  *Id.*  The Court reasoned that "cumulative impact statements are required only when the action is actually a 'proposed action'" and that the potential flood protection project did not qualify.  *Id.* at 1015–16; see also *Miss. River Basin Alliance*, 230 F.3d at 175–76 & n.6 (cumulative impacts analysis in EIS for Mississippi River flood control project properly addressed other proposed projects).  Similarly, here the three deepwater port projects excluded from the cumulative impacts analysis had not been proposed by the Administrator (but rather only by the respective applicants) at the time of

the EIS, and it was uncertain whether these projects would be realized and what their eventual impacts would be.

More recently, this Court in *City of Shoreacres* agreed with an agency that the possibility that a ship channel would be deepened was too speculative to require discussion in a cumulative impact analysis for a permit to construct a neighboring ship terminal. 420 F.3d at 451–54. The Court emphasized that "for a number of reasons it is impossible to know whether the channel will ever be deepened." *Id.* at 453; see also *Vieux Carre Prop. Owners*, 719 F.2d at 1277–78 (decision whether to prepare EIS for development project did not need to account for cumulative effects of speculative later phases). Similarly, here it was unknown whether the Administrator would even grant the licenses whose impacts petitioners believe should have been analyzed, let alone what those impacts would be.

## II.     THE ADMINISTRATOR COMPLIED WITH THE DEEPWATER PORT ACT.

Petitioners' argument under the Deepwater Port Act is also meritless. The EIS indicates that ORV will have minor adverse effects on offshore species but no significant impacts on biological resources overall. AR 61, at 4-5 to 4-9, 4-22 to 4-25, 4-28, 4-31, 4-33, 4-35, 4-37 to 4-50. The EIS also indicates, however, that ORV will have a "higher effect" on water quality and marine life than petitioners' preferred technology for regasifying LNG. AR 59, at 2-10. Petitioners argue that

the statute unambiguously requires the technology that is best for the marine

environment, with no place in the analysis for any other considerations, and thus

that the Administrator acted contrary to law in issuing the license. Pet. Br. 23–29.

This argument fails to accord proper deference to the Administrator's statutory

interpretation, which is consistent with the Deepwater Port Act and reasonable.

### A.    This Court Should Defer to the Administrator's Statutory Interpretation, Which Is Both Consistent with the Deepwater Port Act and Reasonable.

The Deepwater Port Act indicates that the Administrator may issue a license

only if nine separate conditions are satisfied. 33 U.S.C. 1503(c). The specific one

of these conditions at issue here indicates that the Administrator may grant a

license only if:

> he determines, in accordance with the environmental review criteria established pursuant to [33 U.S.C. 1505], that the applicant has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment.

33 U.S.C. 1503(c)(5). The Administrator believes that this provision requires him

when evaluating license applications in light of the nine conditions to consider

carefully the impacts of competing technologies on the marine environment, but

not necessarily to choose the single technology that is best for the marine

environment when that technology is demonstrably inferior in every other regard to

another technology that minimizes impacts on the marine environment to a

reasonable degree given all relevant considerations.  Thus, in the order under review, the Administrator chose ORV as the "best available technology" even though, as petitioners indicate, he acknowledged that ORV was "not environmentally preferable" in "[t]he one area" of "effects on water quality and marine life."[12]  AR 95, at 15–16, 19; see AR 59, at 2-7 to 2-11.

Applying the deferential *Chevron* analysis, this Court should accept the Administrator's statutory interpretation.  Under the first step of this analysis, the statute does not unambiguously require that a deepwater port use the single technology best for the marine environment even if that technology is worse for the Nation as a whole and, indeed, the environment as a whole.  Although this Court need not even reach the second step of *Chevron* given that petitioners do not, we note as well that the Administrator's statutory interpretation is reasonable.

1. <u>*Chevron* step one</u>. — The question at the first step of the *Chevron* is "whether Congress has directly spoken to the precise question at issue" or instead has been "silent or ambiguous."  467 U.S. at 842–43.  The statutory language does not unambiguously require petitioners' construction of the "best available

---

[12]     It bears note that the finding that ORV was not preferable regarding water quality and marine life does not mean that ORV was not preferable regarding the marine environment as a whole.  The Deepwater Port Act defines "marine environment" to include not only water quality and marine life, but also the "coastal environment," defined in turn to include adjacent shorelines, recreational and scenic values, and more.  33 U.S.C. 1502(5), (12).

-34-

technology" requirement but rather is consistent with the Administrator's construction.

Petitioners' argument depends on a misreading of the clause that ends the provision in question, which requires the use of "best available technology, so as to prevent or minimize adverse impact on the marine environment."  33 U.S.C. 1503(c)(5).  The word "minimize" in this clause is best read to refer to what minimizes adverse impact on the marine environment to a reasonable degree given other relevant considerations.  The provision might be compared to a recipe instruction to "use best available cooking techniques, so as to prevent or minimize food poisoning."  No reasonable chef would read that instruction to mean that all flavor must be sacrificed for a marginal reduction in the likelihood of food poisoning.  Similarly, the determination of what technology is the best available certainly must account for the marine environment, but the provision does not require the "technology that results in the least adverse impact on the marine environment," let alone do so unambiguously enough to require such a construction under *Chevron*.[13]

---

[13]     Furthermore, the ending clause may be read as predictive, not prescriptive: the comma and the words "so as" may indicate that Congress was describing the expected effect of requiring the use of best available technology — that is, adverse effect on the marine environment will be prevented or minimized — rather than presenting the sole consideration by which the Administrator must gauge which technology is best.  Of course, by explicitly setting forth Congress' expectation

(continued...)

While overreading one clause in this provision, petitioners ignore another relevant clause entirely. The Deepwater Port Act requires the Administrator to make his determination regarding best available technology "in accordance with the environmental review criteria established pursuant to [33 U.S.C. 1505]." 33 U.S.C. 1503(c)(5). These comprehensive criteria cover the fabrication, construction, operation, and decommissioning of ports and all aspects of the environment, oceanographic currents and wave patterns, and human health and welfare. 33 U.S.C. 1505; 33 C.F.R. 148.705–.735. Petitioners would have the Administrator ignore most of those criteria entirely whenever any technology is even marginally superior to another with regard to impacts on the marine environment. If Congress had intended to require the Administrator to base his determination on the marine environment alone, it would not have required him to consider environmental criteria more broadly.

Although we know of no reported opinions discussing this particular Deepwater Port Act provision, it is similar in some respects to Clean Air Act provisions regarding what factors EPA may consider in setting emissions standards. This Court and the D.C. Circuit have both established that EPA in

---

[13]/(...continued)
that use of the best available technology will prevent or minimize adverse impact on the marine environment, the clause makes apparent at least that Congress wished effects on the marine environment to be a crucial part of the decisionmaking process.

doing so has regulatory discretion to consider factors such as cost and technological feasibility absent a clear indication of contrary congressional intent. *E.g.*, *Sierra Club v. EPA*, 314 F.3d 735, 744 (5th Cir. 2002) (EPA can make "determinations based on a cost/benefit analysis * * * unless the statutory scheme precludes such a determination"); *Michigan v. EPA*, 213 F.3d 663, 678 (D.C. Cir. 2000) ("[P]reclusion of cost consideration requires a rather express congressional direction."); *George E. Warren Corp. v. EPA*, 159 F.3d 616, 623 (D.C. Cir. 1998) (EPA could consider effects on "the price and supply of gasoline"); *Natural Res. Def. Council v. EPA*, 824 F.2d 1146, 1163 (D.C. Cir. 1987) (en banc) ("Since we cannot discern clear congressional intent to preclude consideration of cost and technological feasibility in setting emission standards * * * , we * * * find that [EPA's] Administrator may consider these factors."). Similarly, the Deepwater Port Act does not clearly preclude consideration of factors other than the marine environment in determining what technology is the best available technology.

2. *Chevron* step two. — Petitioners never argue that the Administrator's statutory interpretation is unreasonable and thus waive any argument at the second step of the *Chevron* analysis. See *In re Tex. Mortgage Servs.*, 761 F.2d 1068, 1073 (5th Cir. 1985) (arguments not raised in opening brief are waived). In any event, the Administrator's interpretation is manifestly reasonable.

Another one of the nine conditions that the Administrator must meet before issuing a license under the Deepwater Port Act is that he must:

> determine[] that the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality.

33 U.S.C. 1503(c)(3). As this provision makes explicit, the Administrator must act in accordance with the overall national interest. Protection of the marine environment is included in that interest but not solely determinative of it. Petitioners, however, would have the Administrator require the technology that is best for the marine environment even if it is demonstrably worse for the national interest overall and the environment in particular. They would have the Administrator require the use of SCV here even though the Administrator found that it entails more air pollution and is less energy-efficient and that "Gulf Landing will contribute to an overall improvement in our * * * environment." AR 95, at 15–16. It is unreasonable to suppose that the Deepwater Port Act requires such a result, especially given the legislative history indicating that Congress enacted the statute in part because the construction and operation of deepwater ports would remove environmental impacts and risks from the mainland. *E.g.*, S. Rep. No. 93-1217, at 5–7, *reprinted at* 1974 U.S.C.C.A.N. 7529, 7533–35; 120 Cong. Rec. 34,653 (1974) (letter from environmental groups including petitioner Sierra Club

recommending passage of Deepwater Port Act).  The Administrator's reading of

the "best available technology" provision is more protective of the overall national

interest and the environment as a whole.[14]

Furthermore, the Administrator's interpretation makes sense given

Congress' purposes in enacting the Deepwater Port Act.  Among other things,

Congress sought to "promote the construction and operation of deepwater ports as

a safe and effective means of importing oil or natural gas into the United States."

33 U.S.C. 1501(a)(5); see 33 U.S.C. 1501(a)(1) (purpose to "authorize and regulate

the location, ownership, construction, and operation" of deepwater ports).  This

purpose would be compromised if the "best available technology" requirement

were read to require the technology that is best for the marine environment even if,

for instance, its costs were so prohibitive that no applicant would ever actually

construct a port using it.  In the order under review, the Administrator made clear

that requiring applicants to use SCV, petitioners' preferred technology, could cause

Gulf Landing "and other applicants to delay or abandon the construction of natural

---

[14]     Indeed, a regulation promulgated to implement 33 U.S.C. 1503(c)(3)
requires each applicant to show "[u]nder the environmental review criteria * * *
that the deepwater port will be fabricated, constructed, operated, and
decommissioned using the best available technology to prevent or minimize
adverse impact on the *environment*" — *not* merely the "marine environment."  33
C.F.R. 148.710(a)(2) (emphasis added).  Petitioners cite this regulation but do not
contend that the Administrator failed to comply with it, perhaps because of the
Administrator's unchallenged findings that SCV will yield more air pollution and
be less energy-efficient than ORV.  Pet. Br. 23–24; AR 95, at 15–16.

gas infrastructure," with unacceptable effects on the economy.  AR 95, at 15–16.

Although petitioners cite a comment that the choice of ORV passes costs relating

to the marine environment on to the public (Pet. Br. 27), they do not dispute the

Administrator's assessment of the overall economic effects that would ensue if

SCV were an absolute requirement.

Although Congress also sought to "provide for the protection of the marine

and coastal environment to prevent *or minimize* any adverse impact which might

occur as a consequence of the development of such ports," 33 U.S.C. 1501(a)(2)

(emphasis added), Congress surely recognized that any deepwater port necessarily

will have *some* impact on the marine environment.  It is unreasonable to suppose

that Congress intended to require the use of a technology that is marginally

superior with regard to the marine environment but markedly inferior in every

other respect.  Cf. *Am. Petroleum Inst. v. EPA*, 787 F.2d 965, 972 (5th Cir. 1986)

("EPA would disserve its mandate were it to tilt at windmills by imposing ["best

available technology economically achievable" standards under the Clean Water

Act] which removed de minimis amounts of polluting agents from our nation's

waters while imposing possibly disabling costs on the regulated industry.").

Finally, the adoption of petitioners' construction of the statute could result in

a scenario in which the mere availability of a particular technology would make it

impossible for a license ever to issue.  To wit, if one technology was marginally

better for the marine environment but no port using that technology could be

operated in the overall national interest — because, for instance, it causes so much

air pollution — petitioners would apparently conclude that no license could issue

at all, because the Administrator could not find make the necessary findings under

both 33 U.S.C. 1503(c)(3) and 33 U.S.C. 1503(c)(5).  The mere happenstance that

such a technology might be available should not prevent any license from issuing

even when the licensing of a deepwater port is clearly in the national interest.  That

result would be contrary to Congress' express purposes and unreasonable.

### B.    Petitioners Do Not Claim That the Administrator's Decision Was Arbitrary or Capricious on Its Merits.

As their brief makes clear, petitioners argue that the Administrator's

decision is "contrary to law" in that the "availability of a technology that would

have fewer impacts on the marine environment" makes adoption of that technology

an inexorable legal requirement.  Pet. Br. 12, 24.  Petitioners do not go further and

argue that the Administrator's decision was arbitrary or capricious as a whole even

if the Administrator's contrary statutory interpretation was correct.  Accordingly,

that argument is waived.[15/]  See *In re Tex. Mortgage Servs.*, 761 F.2d at 1073.

---

[15/]     Petitioners do claim that the Administrator's supposed failure to examine cumulative impacts properly deprived him of "full information about impacts to the marine environment" in supposedly setting a "precedent" for Gulf of Mexico fisheries.  Pet. Br. 24, 29.  That argument sounds under NEPA and is wrong for the reasons above.  The Deepwater Port Act has no independent requirement regarding

(continued...)

-41-

In any event, any such argument would fail.  The EIS indicates, for instance, that ORV will have minor adverse effects on offshore species but no significant impacts on biological resources overall.  AR 61, at 4-5 to 4-9, 4-22 to 4-25, 4-28, 4-31, 4-33, 4-35, 4-37 to 4-50.  The Administrator accordingly concluded that ORV in this instance would not produce significant negative impacts.  AR 95, at 15; see AR 95, at 19 (referencing EIS).  Moreover, petitioners do not challenge the numerous findings in the EIS and the Administrator's decision that ORV is superior to SCV in many ways.  Although ORV may have a greater effect on water quality and marine life in this case, ORV is safer, more reliable, less expensive, and more energy-efficient, and it results in the emission of less air pollution.[16]  AR 59, at 2-7 to 2-11; AR 95, at 15–16.  Even if petitioners had challenged those findings, the administrative record contains substantial evidence supporting them and thus they are conclusive.  5 U.S.C. 706(2)(E); see, *e.g.*, AR 150; AR 188, at 4 & att. E.  The decision that ORV is the best available technology in the context of this particular license application is one within the Administrator's discretion to

---

[15]/(...continued)
cumulative impact analyses.  Moreover, petitioners are wrong to the extent they suggest that this decision implies the Administrator necessarily will require ORV in future license applications.  The EIS recognizes that selection of a technology to vaporize LNG "depends on case-by-case evaluation."  AR 59, at 2-9, 2-11.

[16]/    Petitioners incorrectly state that the Administrator selected ORV merely because of "reliability and cost."  Pet. Br. 25.  As his decision and the EIS make clear, his reasons were much broader.  AR 95, at 15–16, 19; AR 59, at 2-7 to 2-11.

make, especially given the deference due to a decision informed by technical expertise. *Baltimore Gas & Elec.*, 462 U.S. at 103; *Avoyelles Sportsmen's League*, 715 F.2d at 905.

## CONCLUSION

For the reasons set forth above, we respectfully submit that the petition for review should be denied.

Respectfully submitted,

KELLY A. JOHNSON
Acting Assistant Attorney General

JOHN A. BRYSON
TODD S. KIM
Attorneys, U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 23795 (L'Enfant Plaza Station)
Washington, D.C. 20026
(202) 514-2762

90-13-1-11602
November 14, 2005

## CERTIFICATE OF SERVICE

I certify that on November 14, 2005, copies of this brief and a diskette with

an electronic version of this brief were delivered by Federal Express to the Clerk of

this Court and served via United States post and e-mail to counsel of record at:

Karla Raettig                              Kevin A. Ewing
Environmental Integrity Project            Bracewell & Giuliani LLP
919 18th St. NW, Ste. 650                  2000 K St., NW, Ste. 500
Washington, DC 20006                       Washington, DC 20006-1872
kraettig@environmentalintegrity.org        kevin.ewing@bracewellgiuliani.com

Warren W. Harris
Bracewell & Giuliani LLP
711 Louisiana St., Ste. 2300
Houston, TX 77002-2770
warren.harris@bracewellgiuliani.com

David A. Savage
Baker Botts LLP
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, TX 78701-4039
david.savage@bakerbotts.com

## CERTIFICATE OF COMPLIANCE

I further certify that, pursuant to Federal Rule of Appellate Procedure

32(a)(7)(c) and Fifth Circuit Rule 32.3, the attached brief is proportionately

spaced, has a typeface of 14 points or more, and contains 10,466 words.

_____
Todd S. Kim
Attorney, U.S. Department of Justice